[No. S006546. Nov. 12, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT PAUL WILSON, Defendant and Appellant.

928

## COUNSEL

Bradley S. Phillips, under appointment by the Supreme Court, and Ruth E. Fisher for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, Margaret Garnand Venturi and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—Following the guilt phase of a jury trial, defendant Robert Paul Wilson was found guilty of one count of first degree murder (Pen. Code, §§ 187, 189)[1] and one count of robbery (§ 211). The jury also found that defendant used a firearm in the commission of each offense (§ 12022.5, subd. (a)), and found true a special circumstance allegation that he committed the murder during the course of a robbery (§ 190.2, subd. (a)(17)(i)). Following the penalty phase of the trial, the jury imposed the death penalty.

In the companion habeas corpus proceeding, we conclude that the judgment must be vacated in its entirety. (*In re Wilson, post*, p. 945 [13 Cal.Rptr. 269, 838 P.2d 1222].) Accordingly, we dismiss the appeal as moot but, in an attempt to avoid the recurrence of error on retrial, we discuss certain issues for the guidance of the parties and the trial court on remand.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

F<span style="font-variant:small-caps">ACTS</span>

## I.  G<span style="font-variant:small-caps">UILT</span> P<span style="font-variant:small-caps">HASE</span> E<span style="font-variant:small-caps">VIDENCE</span>

### A.  *The prosecution's case.*

#### 1.  *The crimes.*

The victim, Roy Swader, resided in Tucson, Arizona. He would purchase tools in California and sell them at a "swap meet" in Tucson, regularly travelling to California every Monday and returning to Arizona the following day. He often carried substantial amounts of cash on his person in a "trucker's wallet" affixed to his belt with a chain.

In 1984, defendant worked for Swader and resided with him temporarily. He often accompanied Swader on his trips to California. In late August 1984, approximately one week before the commission of the crimes, defendant was at the Tucson residence of Wayne Anderson and Sonia Craven (with whom defendant then was living), counting the sales proceeds from the swap meet. He told an acquaintance, Kimberly Christian (who also worked at the swap meet and knew Swader), that there were "four fucking thousand dollars" on the table, and that "he was tempted to knock Roy off and take the money because he could live good on four fucking thousand dollars."

In early September 1984, Swader bought a handgun at the swap meet and brought it home.

On the morning of September 4, Swader loaded his van and trailer to drive to California, and that evening drove them into a Shell service station in Indio, California. Robert Berrie, the station attendant, recognized Swader, who had stopped at the station on previous occasions. Another man, whom Berrie described as "skinny," was with Swader. Swader entered the station mini-mart and told Berrie he wanted to purchase gas and a carton of milk. He then went out to refuel the van. The other man came into the mini-mart and filled a paper cup with Pepsi. Swader returned to pay for the various items, and Berrie gave him a receipt for the gas purchase. Swader was carrying a large black wallet with a chain attached.

On September 5, approximately noon, Swader's body was discovered in his van in the parking area of a park in Long Beach, California. He had been shot twice in the head; his belt was undone, and his wallet was missing. Swader's left front pants pocket was pulled out, and a $20 bill was in a rear pocket. A pillow and a blanket were next to the body. The gas receipt from

the Indio Shell service station was in Swader's shirt pocket. There was no evidence of forced entry into the van, and the two back doors were unlocked. A black T-shirt and a pair of jeans were found inside the van. The T-shirt subsequently was identified as one that defendant had worn. The jeans were much smaller than Swader's size.

A latent impression of defendant's left middle fingerprint was taken from the inside portion of the driver's door below the window of Swader's van.

On September 6, 1984, Detectives Miller and Collette of the Long Beach Police Department contacted Berrie at the Shell service station. Berrie identified Swader's van and trailer from photographs and confirmed that Swader had purchased gas at the station on September 4. On September 14, when the detectives returned to the service station, Berrie identified defendant from a photographic lineup as the man who was with Swader on September 4. Berrie told the detectives he could positively identify that man, were he to see him in person. At the trial in May 1988, when asked whether he could identify that man in the courtroom, Berrie testified he was not positive and then pointed to an individual (not defendant) in the spectator portion of the courtroom.

On September 7, 1984, the Long Beach detectives travelled to Tucson to the former residence of Wayne Anderson and Sonia Craven, which those individuals had abandoned. A search of the premises revealed paperwork bearing defendant's name, indicating that defendant was from the State of Kansas.

At trial, Kimberly Christian testified that a few days after Swader's murder, she saw defendant at the swap meet in Tucson. Someone then informed her that Swader's body had been found in California. The next day, Christian saw defendant with Anderson and Craven at their residence. Anderson had a van, which Christian assumed he had stolen, because Anderson had been "broke." When someone raised the subject of Swader's death, defendant became nervous and then left. Christian did not see defendant again prior to trial. She never again saw Anderson or Craven.

Defendant was arrested in Las Vegas, Nevada, in October 1984 and was returned to Los Angeles County. On January 23, 1985, he was arraigned in Los Angeles County Superior Court on charges of murdering and robbing Swader.

### 2. *Testimony of Farrell Torregano.*

In April 1987, Farrell Torregano was a fellow inmate with defendant at the Los Angeles County jail. On direct examination of this witness, the prosecution elicited the fact that Torregano had "suffered a felony or two . . . ."

Torregano testified that defendant, in the course of several conversations, confessed to committing the present crimes, stating that defendant had worked for a man named Swader, that defendant needed more money and had asked Swader for a loan, but that Swader would not lend him money. Defendant admitted to Torregano that he had shot Swader in the head twice as the victim slept. According to Torregano, defendant said he had left some money on the victim's person so that the killing would not appear related to a robbery, and then took the remaining money and fled.

### 3. *Testimony of Donald Raymond Loar and Frank Kovacevich.*

Donald Raymond Loar was a convicted felon who had testified at the request of the Los Angeles County District Attorney in other cases prior to his testimony in the present case. He testified that in October 1987 he was in the protective custody unit of the Los Angeles County jail. He first met defendant while attending church services at the jail, and then was defendant's cellmate for approximately six to eight weeks. While the two men were "discussing cases," defendant told Loar that he was charged with murder and wanted a witness in Indio eliminated. Loar testified: "Well, we was discussing the cases and people, relatives and all of that. [¶] And my wife's godfather is Jimmy Hoffa, [*sic*] dad is secretary treasurer to the Teamster's union. [¶] [Defendant] felt that I had Mafia ties, I guess, and he told me that there was a witness that was a thorn in his side that could do him a lot of harm if he testified, that could put him and a murder victim together. [¶] And he wanted me to get somebody from back east or a hit man, so to speak, to get rid of the witness so he wouldn't have to worry about—about that guy in court. He would beat his murder case . . . . [¶] . . . He wanted the guy eliminated."

Loar testified that following this conversation, he telephoned the district attorney's office and spoke to Deputy District Attorney Hodgman about Loar's conversation with defendant. In doing so, Loar hoped that, in exchange for his cooperation, he would receive favorable treatment with regard to his own case.

Hodgman referred Loar to a district attorney's investigator, Frank Kovacevich, who in turn arranged to impersonate the "hit man" whom defendant sought to contact. Loar placed a telephone call to Kovacevich from the jail, told Kovacevich that defendant wished to speak with him, and handed defendant the telephone. Loar testified that following the telephone conversation, defendant appeared relieved and happy, stating that the "problem is going to be resolved, that the guy he just talked to is going to take care of the witness for—for him." Loar testified that, at the request of Kovacevich, he

arranged for a second telephone conversation between Kovacevich and defendant.

Kovacevich testified that on October 28, 1987, following a telephone call from Loar, he arranged to speak to defendant telephonically while impersonating a hired assassin. Kovacevich had two telephone conversations with defendant, both of which were tape-recorded. The tape recordings of the conversations (the transcriptions of which are set forth in relevant part in the margin below[2]) were played to the jury at trial.

### 4. *Evidence of defendant's indebtedness.*

The prosecution offered into evidence the fact of defendant's prior conviction of felony theft in Kansas and the resulting condition of probation requiring that defendant make restitution in the amount of $13,007. The prosecution argued that evidence of a large restitutionary order, imposed nine months prior to the commission of the murder and the robbery, was probative of a motive for defendant to commit the present crimes. Defense counsel objected on the ground that the probative value of such evidence was outweighed by its prejudicial effect. (Evid. Code, § 352.) Although defense counsel maintained his objection to any evidence of indebtedness, on the ground of irrelevance, the trial court permitted a "sanitized" statement to be read to the jury to the effect that pursuant to court order imposed on December 29, 1983, "the defendant was ordered to pay, to a governmental agency in the State of Kansas, the amount of $13,007 . . . ."

---

[2]When handed the telephone, defendant initiated the first conversation by telling Kovacevich that "we've got some business to take care of" in Indio. Pertinent portions of the conversation are as follows: "[Defendant:] Okay. There is—on the interstate 10 there is a exit ramp named Monroe. [¶] [Kovacevich:] Oh, what's the—what's the name of that? [¶] [Defendant:] It's Monroe Street. . . . [¶] . . . go straight into Indio, the first gas station you come to is called—it's just called—uh—the She—it's a Shell station. It's kind of a gas station/convenience store. . . . [¶] . . . There's a person there by the name of Bernie, B-u-r-r-i—n-i-e, I think. . . . [¶] . . . Yeah. I believe it's Richard Bernie, I'm not positive about the first name. . . . [¶] . . . [Kovacevich:] Oh. Now—now, what do you want done with this guy? [¶] [Defendant:] Uh—wherever you—I'm kind of in a tight scrape and this—this crazy thing is going on with—it's—he's going to end up walkin in here and spitting out a bunch of lies which could put me in one hell of a whole lot of trouble. [¶] [Kovacevich:] Uh-huh. And what's this—is this for—what—what's—what is for . . . court appearance or what? [¶] [Defendant:] Yeah, that's basically what it's boiling down to. . . . [¶] . . . He doesn't need to be there. . . . [¶] . . . It would be—let's put it this way, it would be most helpful if he wasn't. . . . [¶] . . . [Kovacevich:] Now, what do you—what did you want done with this guy? I mean, do you want us—do you want us to scare him or what? [¶] [Defendant:] Well, you—well, you—I don't think—I think it's gonna come out a little bit more drastic than that. I think it's be better if he just kind of took a permanent vacation. . . ."

During the second telephone conversation, Kovacevich told defendant that his "guy" had visited the Shell station but that no one by the name of Richard Bernie worked there. Defendant confirmed the description of the station attendant and said that perhaps his name was "Barrie."

### B. *The defense case.*

Defendant did not testify, and the defense presented no evidence. In closing argument, defense counsel argued that the circumstantial evidence was not inconsistent with a finding that defendant was not the perpetrator of the crimes.

The jury found defendant guilty of both charged offenses and found true the firearm-use enhancements, as well as the robbery-murder special circumstance.

## II.  PENALTY PHASE EVIDENCE

### A.  *The prosecution's case.*

The prosecution and the defense stipulated that on December 2, 1983, defendant was convicted of the offense of felony theft in the State of Kansas. During closing argument, the prosecutor referred repeatedly to the guilt phase evidence that defendant had solicited Berrie's murder.

### B.  *The defense case.*

The defense presented evidence that defendant had cooperated with the prosecution in several other cases. A police investigator testified that in June 1986, defendant provided information to the Pasadena Police Department concerning another murder case. Defendant was subpoenaed to testify at the preliminary hearing of that case but was not called as a witness. A deputy district attorney testified that in 1987 defendant was a rebuttal witness at another murder trial.

A pastor testified defendant regularly attended Bible study classes conducted in jail. Defendant's wife testified that defendant did not have "a violent bone in his body." A longtime friend described defendant as a nonviolent person.

A clinical forensic psychologist opined that defendant suffered from minimal brain dysfunction and that the commission of the murder was inconsistent with defendant's character.

At the conclusion of the penalty phase, the jury fixed the penalty at death.

DISCUSSION

## I. GUILT PHASE ISSUES

### A. *Ineffective assistance of counsel.*

Defendant initially contends he was deprived of effective assistance of counsel guaranteed by the Sixth Amendment to the federal Constitution because of his counsel's allegedly deficient representation in numerous respects, including counsel's failure to object to the testimony of Loar and Kovacevich and to the tape recordings of the telephone conversations between defendant and Kovacevich.

Our past decisions establish, with regard to ineffective-assistance-of-counsel claims, that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d, 2 A.L.R.4th 1]; see *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Cox* (1991) 53 Cal.3d 618, 659 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Bell* (1989) 49 Cal.3d 502, 546 [262 Cal.Rptr. 1, 778 P.2d 129].) As we explained in *Pope, supra*, 23 Cal.3d 412, 426, because, in general, it is inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct when the record on appeal does not illuminate the basis for the attorney's challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct. "Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence." (*Id.*, at p. 426, fn. omitted.) We recommended in *Pope* that, "[t]o promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representation should join a verified petition for writ of habeas corpus." (*Id.*, at pp. 426-427, fn. 17.)

In accordance with our recommendation in *Pope*, defendant's appellate counsel, following the completion of briefing in the appeal, filed a petition for writ of habeas corpus seeking relief from the judgment on the ground of ineffective assistance of trial counsel, corresponding to the claim asserted on appeal. The petition alleged that defendant was deprived of competent representation because, among other things, his counsel failed to object to

the admission at trial of the testimony of Loar and Kovacevich and the tape recordings, all of which evidence assertedly was inadmissible against defendant under *Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250-251, 84 S.Ct. 1199], and its progeny. Following the filing of an informal response to the petition by the Attorney General, we concluded the petition stated a prima facie case and issued an order directing the Attorney General to show cause why the relief prayed for in the petition should not be granted.

The petition, return, and traverse, with supporting declarations and memoranda of points and authorities, established, with respect to trial counsel's failure to object to the testimony of Loar and Kovacevich and the tape recordings, that there were no disputed factual issues regarding either (1) the circumstances underlying the testimony of Loar and Kovacevich, and the tape recordings, established by the appellate record and not controverted by the return, or (2) trial counsel's reasons for his failure to object. Accordingly, we determined that no evidentiary hearing was required with respect to defendant's claim of incompetence of counsel based upon this omission. (See *In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257] [if there are no disputed material factual allegations, the court may dispose of the petition without the necessity of an evidentiary hearing].)

For the reasons set forth in the accompanying opinion in the habeas corpus proceeding, we have concluded that the testimony of Kovacevich and a portion of the testimony of Loar, as well as the tape recordings of defendant's telephone conversations with Kovacevich, were inadmissible under *Massiah* v. *United States, supra,* 377 U.S. 201, and its progeny; that counsel's failure to object to this evidence was the result of ignorance and a misinterpretation of these authorities, rather than an informed tactical decision; and, accordingly, that counsel's omission constituted deficient performance. Concluding further that such deficient performance was prejudicial to petitioner, we have held that defendant was deprived of constitutionally guaranteed effective assistance of counsel at the guilt phase, and that this error requires setting aside the judgment in its entirety.

In light of the disposition of the habeas corpus proceeding, there is no need to resolve any of the remaining ineffective-assistance-of-counsel claims or most of the other claims raised in the briefs on appeal. For the guidance of the parties and the trial court on remand, however, we shall address several issues, raised on appeal, that are likely to recur on retrial.

B. *Admission of photographs of the victim's wounds.*

Over objection of defense counsel, the trial court admitted into evidence three photographs of the victim, showing his body on the floor of the van

with two bullet wounds in the head. The prosecutor offered this evidence as probative of "[t]he condition of the victim's body with the belt undone and the pocket pulled out," and as circumstantial evidence of the perpetrator's intent to kill.

■ Maintaining that the trial court erred in admitting these photographs, defendant argues they were irrelevant to any contested issue at trial and highly prejudicial.

The photographs were relevant in depicting the nature and placement of the wounds, thus supporting the prosecution's theory that the victim was shot deliberately while asleep and without a struggle. (See *People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610].) They also depicted the victim's belt undone, a circumstance supporting the prosecution's theory that his trucker's wallet had been affixed to his belt and was removed by the assailant.

Defendant contends uncontradicted testimony established the location and condition of the victim's body and clothing and the nature of his wounds, and that the photographs therefore were merely cumulative. But "[w]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony." (*People* v. *Price, supra,* 1 Cal.4th at p. 441; *People* v. *Kaurish* (1990) 52 Cal.3d 648, 684 [276 Cal.Rptr. 788, 802 P.2d 278].) Because the photographic evidence could have assisted the jury in understanding and evaluating the testimony presented to them, the trial court's determination that such evidence had sufficient probative value to warrant its admission was not erroneous.

■ Finally, a trial court has broad discretion in determining the admissibility of murder victim photographs in the face of a claim that they are unduly gruesome or inflammatory. (See *People* v. *Price, supra,* 1 Cal.4th at p. 441.) ■ Here, the record reflects the trial court weighed the probative value of the photographs against their potential prejudicial effect before admitting them, thereby properly exercising its discretion. Moreover, our independent review of the photographs persuades us they were not unduly shocking or inflammatory. (See *People* v. *Turner* (1990) 50 Cal.3d 668, 707 [268 Cal.Rptr. 706, 789 P.2d 887].) We find no abuse of discretion.

C. *Admission of evidence of indebtedness.*

■ Defendant contends the trial court erred in admitting evidence of the debt he owed to the State of Kansas in the amount of $13,007. The court

ruled, over defense counsel's objection, that the evidence of indebtedness was relevant to prove a possible motive for the commission of the crimes.

We agree with defendant's claim that the trial court erred in admitting evidence of this debt. Evidence of a defendant's poverty or indebtedness generally is inadmissible to establish motive to commit robbery or theft, because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered outweighed by the risk of prejudice. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1024 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Hogan* (1982) 31 Cal.3d 815, 854 [183 Cal.Rptr. 817, 647 P.2d 93].) Under certain circumstances, however, evidence of poverty or indebtedness may be relevant and admissible for limited purposes, such as to refute a defendant's claim that he did not commit the robbery because he did not need the money. (*People* v. *Gorgol* (1953) 122 Cal.App.2d 281, 303 [265 P.2d 69].)

In the present case, the evidence of defendant's debt was admitted for the improper purpose of establishing defendant's motive to commit the robbery and murder, and was not admissible on any proper ground. Defendant did not testify at trial that he did not need any money. The probative value of the evidence of debt therefore was outweighed by its prejudicial effect, and this evidence should not have been admitted at trial.

### D. *Claims of instructional error.*

Defendant asserts various instructional errors occurred at the guilt phase.

#### 1. *Instruction on other crimes evidence.*

Defendant contends the trial court erred in giving CALJIC No. 2.50,[3] pertaining to evidence of other crimes admitted to prove the identity of the perpetrator. Defendant maintains that the evidence adduced before the jury was insufficient to support a finding that he had committed any crime other than the charged offenses or, alternatively, to support a finding of such other crime probative of his identity as the perpetrator of the charged offenses, and that the instruction therefore was improper.

We disagree. As set forth, *ante*, the prosecution introduced evidence—the testimony of Loar—that defendant had attempted to solicit the murder of

---

[3]All CALJIC references are to California Jury Instructions—Criminal (5th ed. 1988) or to instructions which correspond to the identically numbered instructions in CALJIC fifth edition, unless otherwise indicated.

Berrie, a critical prosecution witness.[4] Solicitation of murder is a criminal offense. (§ 653f, subd. (b).) Evidence of uncharged offenses is admissible under Evidence Code section 1101, subdivision (b), if relevant to prove some fact (such as identity, motive, or knowledge) other than the defendant's disposition to commit such offenses.

Defendant's act of soliciting the murder of a critical prosecution witness was highly probative of defendant's consciousness of guilt, which in turn was probative of his identity as the perpetrator of the charged offenses. (See *People* v. *Edelbacher*, *supra*, 47 Cal.3d at pp. 1006-1007.) The trial court's instruction therefore was justified by the evidence.

Defendant further contends the trial court erred in failing to specify the "other crime" which the jury could consider in determining the issue of identity, thereby improperly allowing the jury to consider the evidence of his prior conviction of theft. Defendant's contention has no merit, because the record establishes that evidence of this prior conviction was *not* received at the guilt phase; only the fact of defendant's indebtedness to the State of Kansas was admitted into evidence at that stage of the proceedings.

### 2. *Failure to instruct on second degree murder.*

■ Defendant contends the trial court erred in refusing instructions requested by defense counsel on second degree murder. The court determined there was insufficient evidence to support the giving of instructions on this lesser offense. Defendant maintains that the refused instructions were warranted because the circumstantial evidence of the crimes did not conclusively establish that the murder was committed during the course of a robbery. He contends the evidence was not inconsistent with the theory that defendant shot and killed the victim in the van and then fled, and that another person then came upon the victim's body and removed the wallet, or that the victim was not carrying a wallet or cash at the time he was shot.

We conclude the trial court did not err in refusing an instruction on second degree murder. The evidence did not support the factual scenarios now advanced by defendant. The victim, last seen carrying a trucker's wallet attached with a chain to his belt, was discovered after his death with his belt undone, and with his wallet and most of his cash missing. Also, the victim

---

[4]The testimony of Loar relating his conversations with defendant prior to Loar's telephone call to the district attorney's office was admissible for the reasons set forth in our accompanying opinion in the habeas corpus proceeding.

had been shot twice in the head, indicating a deliberate, purposeful killing. There is only bare speculation, not substantial evidence, to support the theory presently advanced by defendant—that the murder did not coincide with the taking of the victim's money. Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense. (See *People* v. *Duncan* (1991) 53 Cal.3d 955, 970-971 [281 Cal.Rptr. 273, 810 P.2d 131]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 276 [266 Cal.Rptr. 834, 786 P.2d 892].)

Defendant's reliance on *Beck* v. *Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382] for the proposition that, regardless of the evidence, the court was required to give an instruction on second degree murder, is misplaced. In *Beck*, the high court struck down as unconstitutional a state statute which prohibited instructions on lesser offenses in a capital case, thereby limiting the jury's options to either convicting or acquitting the defendant of the capital crime. The court held that such a restriction was contrary to the long-settled rule that a " 'defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.' " (*Id.*, at p. 635 [65 L.Ed.2d at p. 401].)

In the present case, the trial court had the option of instructing on the lesser offense at the defendant's request, should the evidence warrant such instruction. The evidence did not. Unlike the trial court in *Beck* v. *Alabama, supra,* 447 U.S. 625, the trial court in the present case was not restricted to an all-or-nothing approach regardless of the evidence.

### 3. *Failure to instruct sua sponte on the lesser included offense of theft.*

█ Defendant contends the trial court erred in failing to instruct sua sponte on theft, a lesser included offense of robbery. In support of this contention, he again urges that the evidence did not preclude a finding of the following factual scenarios, among others: that defendant shot the victim and thereafter developed the intent to take the wallet, or that defendant took the wallet while the victim was asleep and sometime thereafter decided to shoot him. Under either scenario, defendant argues, he would be guilty of theft, not robbery.

We find no error. A trial court must instruct on a lesser included offense when the evidence raises a question as to whether all of the elements of the

charged offense are present and there is evidence that would justify a conviction of the lesser offense. (See *People* v. *Duncan*, *supra*, 53 Cal.3d at p. 970; *People* v. *Lewis*, *supra*, 50 Cal.3d 262, 276.) In *People* v. *Kelly* (1992) 1 Cal.4th 495, 529 [3 Cal.Rptr. 2d 677, 822 P.2d 385], the evidence (that the defendant formed the intent to steal only after the killing) required instruction on the lesser included offense of theft. In contrast, in the present case, there was no evidence to support the theory that the underlying offense, if committed by defendant, was other than robbery. Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense.

> 4. *Claim that jury instructions on circumstantial evidence undermined the "reasonable doubt" standard.*

▮▮▮ Defendant contends the trial court's instructions on circumstantial evidence negated the instructions on the presumption of innocence, as well as the standard of proof beyond a reasonable doubt.

The trial court instructed the jury concerning circumstantial evidence in the terms of CALJIC Nos. 2.00 (direct and circumstantial evidence—inferences), 2.01 (sufficiency of circumstantial evidence—generally), 2.02 (sufficiency of circumstantial evidence to prove specific intent), 8.83 (sufficiency of circumstantial evidence to prove the special circumstance), and 8.83.1 (sufficiency of evidence to prove mental state).

CALJIC No. 2.01 informs the jury they may not base a finding of guilt on circumstantial evidence "unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion."

This instruction's concluding paragraph (with which defendant takes issue) provides: "If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Defendant challenges this last paragraph as well as the corresponding paragraphs in CALJIC Nos. 8.83 and 8.83.1, which pertain to the consideration of circumstantial evidence relating to the special circumstance allegation. He argues essentially that such language negates the presumption of innocence and the standard of proof beyond a reasonable doubt, because it

allows the jury to convict merely by finding the prosecution's theory of the case "reasonable" and the defense theory of the case "unreasonable," thus compelling the jury to reject a defense theory which is unreasonable but also true. He also contends the instructions impermissibly create a mandatory conclusive presumption of guilt upon the jury's finding that an interpretation of the evidence unfavorable to the defense is reasonable.

We disagree. ■ " 'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People* v. *Crandell* (1988) 46 Cal.3d 833, 874 [251 Cal.Rptr. 227, 760 P.2d 423], quoting *People* v. *Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251]; see *People* v. *Magana* (1990) 218 Cal.App.3d 951, 956 [267 Cal.Rptr. 414].) ■ Here, CALJIC No. 2.01 makes clear that circumstantial evidence is sufficient to prove guilt only if it "cannot be reconciled with any other rational conclusion." The words "rational" and "reasonable" in the context of CALJIC No. 2.01 must be read in conjunction with the instruction on reasonable doubt (CALJIC No. 2.90). (See *People* v. *Magana*, *supra*, 218 Cal.App.3d at p. 956.) That instruction informs the jurors that in the event they harbor a reasonable doubt concerning guilt, they are required to acquit. Reasonable doubt is that state of the case where consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. (§ 1096.)

Therefore, a reasonable juror would understand that, taken in context, the relevant language of CALJIC No. 2.01 (and the corresponding language of CALJIC Nos. 8.83 and 8.83.1) must be considered in conjunction with the "reasonable doubt" standard. Thus, the jury properly can find the prosecution's theory as to the interpretation of the circumstantial evidence "reasonable" and alternate theories favorable to the defense "unreasonable," within the meaning of these instructions, only if the jury is convinced beyond a reasonable doubt of the accuracy of the prosecution's theory. (*People* v. *Magana*, *supra*, 218 Cal.App.3d at p. 956.) The paragraph criticized by defendant therefore "does not tell the jury to reject interpretations of circumstantial evidence favorable to the defense simply because they are unusual or bizarre, [but] merely tells them to reject interpretations of circumstantial evidence that are so incredible or so devoid of logic that they can, beyond a reasonable doubt, be rejected." (*Ibid.*) Accordingly, when the instructions are viewed as a whole, the disputed language does not undermine the instructions on the presumption of innocence and the standard of proof beyond a reasonable doubt, and does not impermissibly create a mandatory conclusive presumption of guilt.

## DISPOSITION

As noted, in the companion habeas corpus proceeding (*In re Wilson, supra, post,* p. 945) we have concluded that the underlying judgment must be vacated in its entirety on the ground of ineffective assistance of counsel. Accordingly, the appeal is moot and is ordered dismissed.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and Baxter, J., concurred.