[No. C020828. Third Dist. Feb. 13, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN BARRY ESTEP, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of section II of the Discussion.

**COUNSEL**

Alisa M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DAVIS, J.—In a retrial after the first jury deadlocked, a second jury acquitted defendant of first degree murder but convicted him of second degree murder and misdemeanor battery and found he used a firearm to commit the murder. (Pen. Code, §§ 187, 242, 12022.5, subd. (a).) On appeal, defendant contends (1) the instruction on motive (CALJIC No. 2.51) violated due process by erroneously telling the jurors they were to decide between guilt and innocence instead of determining if guilt had been proven beyond a reasonable doubt, and (2) the trial court erred prejudicially in admitting statements from the decedent about defendant's prior bad acts and the decedent's fear of defendant. We disagree with defendant's contentions and affirm the judgment. We publish that part of our opinion rejecting defendant's challenge to CALJIC No. 2.51.

### FACTS

About a week before she died in the summer of 1993, Shirley "Jody" Estep (Jody) had separated from her husband, defendant. The two separated following an argument about Jody having gone to a bar with some female friends on the evening of June 25, 1993.

On June 26, Officer Dale Poppleton answered a domestic dispute call at the Estep residence. Neither party was injured, and there was no sign of a physical struggle. However, clothes were strewn in the front yard. Jody told Poppleton she was afraid of defendant; previously, Poppleton had instructed her on how to obtain a restraining order.

In statements to others, Jody described abusive conduct on defendant's part and stated she was afraid of defendant. We will detail this evidence in our discussion of defendant's contention that it was erroneously admitted.

On the day of her death (July 4, 1993) Jody asked her friend and fellow employee, Karyn Davis, to accompany her to the Estep residence (where defendant was still residing) to pick up the car Jody had driven during their marriage, a Geo Tracker. Jody asked Davis to wait while she got the Tracker because she did not want to be at the residence alone.

When Davis and Jody arrived at the Estep house, the Tracker was not in the driveway as planned. Defendant met Jody on the driveway, gave her a brief hug and a kiss on the cheek, and handed her something small. With her radio and air conditioner on, Davis could not hear what was said. Davis saw defendant follow Jody into the garage, and the garage door close. At intervals, Davis saw the garage door partially open and shut three times. Intrigued, Davis got out of her car and walked up the driveway.

Davis heard Jody screaming for help and defendant saying she was not leaving. The garage door opened partially again; Davis saw Jody on the floor and defendant, naked from the waist down, bending over Jody. Jody yelled for Davis to call 911. Jody's blouse looked ripped open (the autopsy later disclosed the blouse was unbuttoned, not ripped), and defendant was tearing at Jody's skirt. Defendant then grabbed a golf club and raised it as if to hit Davis. Davis stepped back, and defendant pulled Jody back into the garage. Defendant then mumbled unintelligibly about 911.

As the garage door closed again, Davis ran to a neighbor's house to call the police. While on the phone, Davis heard more yelling from the Estep residence and then two gunshots, one right after the other.

Officers Kathryn Domich and Murry Stapp responded and found defendant in the kitchen with a bloody towel wrapped around his waist. Defendant had a severe gunshot wound to the left side of his face. After calling for an ambulance, Domich asked defendant some simple questions since he was having trouble talking. Defendant was coherent, however. Asked where the gun was, defendant pointed to the garage. Asked if his wife had shot him, defendant shook his head from side to side and said "no." Asked who shot him, defendant shrugged his shoulders and said, "I don't know." Asked if he had shot his wife, defendant said "yes" and nodded affirmatively. Asked if he had shot himself, defendant said "no." A paramedic and an emergency room doctor confirmed that defendant was alert and oriented.

An autopsy disclosed that Jody's skirt had been torn on both sides, her bra had been torn in front, and her pantyhose had been torn from the groin area. There was no trauma to Jody's genital area, nor was there any sperm present. Blood of defendant's PGM (phosphoglucomutase) type was found on Jody's skirt, pantyhose, panties and bra.

The fatal weapon (a sawed-off shotgun) was fired into Jody's head from no further than five feet away. Jody had a defensive-like wound on her hand indicating she had been trying to cover her ear with her palm when she was shot.

Pursuant to a search warrant, Officer Spreitzer searched the Estep residence. Defendant and Jody's marriage certificate was displayed on the fireplace mantle. In defendant's briefcase was a note which read, "Dear Mom and Dad, I love you forever, John." Displayed in plain view in the Estep residence were two other notes. One said: "I have AIDS because of her. God, please forgive me." The other stated, "To my mom and dad, it's not your fault. I love you. I just don't fit in. I need to go see Danny [Danny was defendant's deceased older brother]. You can have all my things. Sell them and divide them between John [Jody's son from a former marriage] and Jonathan." Family photographs had been carefully placed throughout the house.

The evidence showed that Jody was HIV negative and defendant stipulated he is too.

Criminalist Robert Garbutt examined the shotgun and analyzed blood and pellet patterns to determine what had occurred. He opined that defendant first shot Jody and then himself.

The defense painted Jody as a dishonest person, who had falsely accused others of physical and sexual abuse.

Defendant's mother and a friend of his both testified that in the spring of 1993 they saw the "suicide-like" note written by defendant that the police had found in plain view in the Estep residence on the day of the shooting. Defendant claimed to have written the note in February or March of 1993, because he was depressed following his grandmother's death during that February.

According to defendant, he and Jody were going to talk about reconciling on July 4. When Jody arrived on the 4th, she went into the garage and called for him. Once defendant was in the garage, Jody unbuttoned her own blouse, removed her underwear, and slid his shorts down; then she reopened the garage door and yelled, "Rape."

As defendant tried to put on his pants and close the garage door, Jody grabbed a golf club and started beating him with it. Defendant grabbed the club while Jody continued to yell "rape." Jody also said she was going to have defendant arrested. Defendant said that if he was to be arrested anyway, it might as well look like rape, and he tore Jody's bra and pantyhose to embarrass her. Then Davis looked into the garage and both he and Jody told her to call 911.

According to defendant, Jody told him she wished he had killed himself previously, so he got the loaded shotgun down from a garage shelf and told

Jody to go ahead and shoot him. When Jody grabbed the gun, a struggle ensued and it went off. Defendant said he was shot first; he did not know Jody had been shot until he was told of her death while he was in the hospital.

Discussion

### I.   The Motive Instruction, CALJIC No. 2.51

■ Defendant contends the motive instruction given here (CALJIC No. 2.51) erroneously told the jurors they were to decide between guilt and innocence instead of determining if guilt had been proven beyond a reasonable doubt. In this way, defendant argues, the instruction violated the due process guaranty of conviction upon proof beyond a reasonable doubt. We disagree.

Pursuant to CALJIC No. 2.51, the trial court instructed the jury as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

This instruction did not tell the jurors their duty was to decide if defendant was guilty or innocent. The jurors' duty in this respect was explained by CALJIC No. 2.90, stating that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt."

CALJIC No. 2.51 did not concern the standard of proof in this case, but merely one circumstance in the proof puzzle—motive. ■ Defendant cannot quarrel with the concept that presence of motive is a circumstance that may tend to establish guilt. The flip side of this indisputable concept is that absence of motive is a circumstance that may tend to establish innocence. Since CALJIC No. 2.51 does not instruct jurors on the standard of proof they are to apply, it would be awkward (and confusing in context) to say that on the one hand "presence of motive may tend to establish guilt" while on the other hand "absence of motive may tend to establish that guilt has not been shown beyond a reasonable doubt." In this way, then, the word "innocence" in CALJIC No. 2.51 plays to a defendant's advantage.

■ In any event, " ' "[i]t is well established in California that the correctness of jury instructions is to be determined from the entire charge of the

court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) ▄▄ The court in *Wilson* rejected a challenge similar to the one defendant makes here. In *Wilson*, the defendant argued that the CALJIC instructions on the weight to be given circumstantial evidence negated the presumption of innocence and the standard of proof of beyond a reasonable doubt. (3 Cal.4th at p. 942.) In rejecting this argument, the *Wilson* court said: "[A] reasonable juror would understand that, taken in context, the relevant language of [the circumstantial evidence instructions] must be considered in conjunction with the 'reasonable doubt' standard [given the jury in CALJIC No. 2.90]." (*Id.* at p. 943.)

Similarly, a reasonable juror in the present case would understand that the language of CALJIC No. 2.51 that motive may tend to establish guilt while lack of motive may tend to establish innocence, cannot be considered a standard of proof instruction apart from the reasonable doubt standard set forth clearly in CALJIC No. 2.90.

We conclude that CALJIC No. 2.51 did not deprive defendant of due process.

II.  *Jody's Statements**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Sparks, Acting P. J., and Brown, J., concurred.

---

*See footnote 1, *ante*, page 733.