Filed 10/29/13  P. v. Crandall CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER CRANDALL,<br><br>    Defendant and Appellant. | A134591<br><br>(San Francisco County<br>Super. Ct. No. 201235) |

## I. INTRODUCTION

After a several-week jury trial (the third such trial for appellant) on a charge of second degree murder, the jury advised the court that it was unable to reach a verdict on that charge.  Over the objections of defense counsel, the court granted the prosecution's motion to dismiss that charge and amend the information to charge appellant with one count of voluntary manslaughter.  The jury found appellant guilty of that charge; he appeals, claiming both instructional error and ineffective assistance of counsel.  We reject appellant's arguments and affirm his conviction for voluntary manslaughter.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2006, the building manager of an apartment building on Polk Street in San Francisco was accompanying a pest control worker, who was working in the various apartments in that building.  When the two of them entered apartment No. 204, an apartment leased to Guy West, they noticed "a very strong odor" in the apartment, and promptly found the body of West, covered in blankets on a bed in a walk-in closet in the

1

apartment.  The building manager summoned the police, who were advised by neighbors in the building that appellant had recently been "a roommate of the victim."

Early the following month, the police detained appellant after being advised that a "wanted person" was in a nearby store.  Two inspectors then interviewed appellant; the interview was videotaped and later played for the jury.

During that interrogation, appellant revealed that he had lived with West for about "eight and a half years," and had initially had a sexual relationship with him, a relationship which later became platonic.  During the days, per West's directions, appellant would stay away from West's apartment until about 5:00 p.m., but then return.  During those days, appellant would walk the streets, look for food in garbage cans, and collect cigarette butts.  At night, appellant slept on a couch in his clothes, while West used the bed in his apartment.  Soon, the friendship of the two men deteriorated, and West would often get angry at appellant when appellant felt he had done nothing wrong.  According to  appellant, "I was always good to him and he was never good back" and "the man was in a lot of ways a monster . . . and I couldn't get away from him."  Indeed, per appellant's statement to the police, West would sometimes threaten appellant, and say such things as: "Don't make me knock your head off."  More recently, West had allegedly "threatened to kill me a few times."  Appellant was afraid to leave the apartment in the evening, however, because he was homeless and "scared of shelters."

Appellant's initial version of events during his questioning by the inspectors was that he had learned from a friend that West had died of natural causes.  When the police told him that such was not the case, appellant surmised that a stranger trying to get into the apartment "through our window" might have been responsible.

After further questioning by the police, however, appellant admitted that he had been responsible for West's death, but that such might have been "some kind of an accident."  Per this version of events, "in the middle of the night" West was, once again, angry with appellant, and had been "screaming and slamming doors."  Appellant told the police that he had "put up with so many years of his crap" and thus completely "lost control," "snapped," picked up a glass pitcher and hit West on the side of his head with it;

2

he did so "more than once" and "from behind." West fell to the floor, made a "weird noise," and appellant then hit West "other times while he was on the ground" with the pitcher. The police asked if West had said "anything while you were hitting him?" Appellant responded: "No, he did not have a chance . . . I was upset, I lost . . . completely lost control."

Per appellant's statement to the police, he told no one about West's death or how it happened much less reported it to the authorities because he thought he would be punished for it. He stayed in West's apartment a few more days, then moved West's body to the bed because "he had already started to decay." He then left the apartment and stayed in shelters and other such places until his arrest.

On March 26, 2007, the San Francisco District Attorney's office filed a one-count information charging appellant with first degree murder. Following a five-day jury trial and jury deliberations of the same length, appellant was acquitted of first degree murder but convicted of second degree murder. On appeal to this court, on July 15, 2010, we reversed that judgment and remanded the case to the trial court for a new trial for appellant. (*People v. Crandall* (A119525, July 15, 2010) [nonpub. opn.].) (Id. 8-27.)

At his second trial the following year, the jury found itself deadlocked between verdicts of voluntary manslaughter and second degree murder. On March 8, 2011,[1] the court declared a mistrial.

The trial the results of which we are now reviewing was, thus, appellant's third trial. It started on September 9 and continued until early October. Jury deliberations began on October 5 and continued the following day. On the next day of their deliberations, October 12 (there was apparently a delay because of a sick juror), the jury sent a note to the court indicating it was deadlocked on the issue of second degree murder. Pursuant to California Rules of Court, rule 2.1036, the trial court then directed the jury to continue its deliberations and, in so doing, to consider whether there were any "specific concerns which if resolved might assist them in reaching a verdict." The jury

---

[1] All further dates noted are in 2011.

3

responded with two questions to which, after conferring with counsel, the court responded. One of those responses was to advise the jury that, pursuant to CALCRIM No. 640, with which it had instructed the jury "you may consider these different kinds of homicide in whatever order you wish, but you cannot reach a verdict on the lesser inclusive of manslaughter until you find the defendant not guilty of second degree murder." Both counsel agreed to this response to the jury.

On October 13, the jury advised the court that it was deadlocked on the principal charge against appellant, i.e., murder in the second degree. The court allowed the district attorney to dismiss that charge and amend the information to charge appellant with voluntary manslaughter. Per the reporter's transcript of that day of the trial, the trial court apparently did so because its clerk said: "[T]he information only has one count, so if you're dismissing that, how would we enter the 192?" The clerk explained that problem further thusly: "So if we dismiss count one, and it's not just the computer, it's general, there will be nothing in the information" and thus "[t]here's nothing in the system. I can't enter the one I need to in the system if it's hung."

Defense counsel then objected "to the late amendment . . . if it's amended to have a new count one . . . ." The trial court disagreed with defense counsel's objection and instructed the jury, via CALCRIM No. 205, that "murder in the second degree no longer needs to be decided in this case. Do not speculate about or consider in any way why you no longer need to decide this count." A very short time later, the jury found appellant guilty of "the lesser included offense, voluntary manslaughter" pursuant to Penal Code section 192, subdivision (a). A few minutes later, the court asked the jury to reconvene and consider a "modified verdict form" which specifically alleged a violation of that section as count one of the information. The jury did so and, again, returned a unanimous verdict of guilty.

On December 9, the court sentenced appellant to the upper term of 11 years in state prison. Appellant filed a timely notice of appeal on December 12.

4

## III. DISCUSSION

Appellant's basic position is that, by allowing the prosecution to amend the information during the jury's deliberations to explicitly charge voluntary manslaughter, a "theory never noticed and never litigated at trial," the trial court effectively denied appellant the effective assistance of counsel, and thus violated the Sixth Amendment of the United States Constitution.

More specifically, appellant argues that, because the prosecution opted to stress to the jury that appellant had committed a "brutal murder of a man" in the latter's home and had thus "proceeded on a theory that Mr. Crandall was guilty of second degree murder," such was the "state's one theory of culpability." He continues: "Of course, the defense never had notice that the state was proceeding on a voluntary manslaughter charge and instead, had built its entire case around disproving the state's original charge of second degree murder by embracing its own voluntary manslaughter theory." Thus, appellant continues, manslaughter was "never noticed as the state's theory of culpability," and it therefore conducted its defense against the charge of second-degree murder "by arguing that Mr. Crandall acted as a result of provocation or in imperfect self-defense, and thus was entitled to a verdict of voluntary manslaughter." Defense counsel thus, per appellant, urged the jury "to find that this was voluntary manslaughter."

Indeed, such is exactly what that counsel did by arguing to the jury that "we're confident you're going to find that this was voluntary manslaughter."

Appellant then contends that the jury was not given any specific instructions on voluntary manslaughter. However, as those briefs concede, CALCRIM Nos. 570 and 571 were given, and that those two instructions "are given in cases where voluntary manslaughter is charged as a lesser included offense of murder." But appellant suggests that that fact does not matter, because the "state was proceeding on the second degree murder charge." He concludes this argument by insisting that, if voluntary manslaughter was indeed the prosecution's theory, the proper instruction to be given was CALCRIM No. 572, citing *People v. Rios* (2000) 23 Cal.4th 450, 461 (*Rios*).

5

However, here the jury was given the standard instructions in a case such as this, where voluntary manslaughter was originally charged as a lesser included offense of murder, i.e., CALCRIM Nos. 570 and 571. The basic charge against appellant was murder, but from the beginning to the end of this trial, and as a matter of law, voluntary manslaughter was a lesser included offense. For example, even before the trial court instructed the jury with CALCRIM Nos. 570 and 571, it instructed them (pursuant to CALCRIM No. 500) that: "Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. The defendant is charged with murder. Manslaughter is a lesser offense to murder."

Appellant is thus incorrect when he argues that voluntary manslaughter was "never noticed" during the trial. It was specifically "noticed" via the several instructions cited above. That conclusion is reinforced by the fact, also noted above, that trial defense counsel specifically approved the court's response to one of the jury's questions, a response which stated that the jury "cannot reach a verdict on the lesser inclusive of manslaughter until you find the defendant not guilty of second degree murder."

Our Supreme Court has, a number of times, made abundantly clear that a given specific felony charge includes necessarily included lesser offenses. Thus, in *People v. Birks* (1998) 19 Cal.4th 108, 118 (*Birks*), a case not cited much less discussed by appellant, the court stated: "When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. Hence, the stated charge notifies the defendant, for due process purposes, that he must also be prepared to defend against any lesser offense necessarily included therein, even if the lesser offense is not expressly set forth in the indictment or information. [Citations.] The statutory law of California explicitly provides that the defendant may be found guilty 'of any offense, the commission of which is *necessarily included* in that with which he is charged.' ([Pen. Code,] § 1159, italics added.) [¶] Consistent with these principles, California decisions have held for decades that even absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is

6

substantial evidence the defendant is guilty only of the lesser. [Citations.]" (See also *People v. Smith* (2013) 57 Cal.4th 232, 239-240.)

Another decision of our Supreme Court—also neither cited nor discussed in appellant's briefs[2]—makes clear that a trial court may, consistent with this principle and Penal Code section 1385, dismiss a charge of murder and allow the jury to consider the lesser-included offense of manslaughter. In *People v. Fields* (1996) 13 Cal.4th 289 (*Fields*), the original jury reported itself deadlocked on multiple charges of gross vehicular manslaughter charged against the defendant, but convicted him of vehicular manslaughter while intoxicated and other counts. The trial court declared a mistrial on the deadlocked counts, and ordered a retrial on those counts, on one of which the second jury found the defendant guilty. The Supreme Court agreed with the Court of Appeal that the retrial on the gross vehicular manslaughter while intoxicated count was barred by the double jeopardy rule, and also ruled that the defendant's conviction on the lesser included offense barred a subsequent prosecution for a greater offense charged earlier. In so holding, the court explained: "[O]nce the jury is discharged after rendering a verdict of guilty on the lesser included offense, without a corresponding verdict of acquittal on the greater offense, the defendant stands convicted of the lesser included offense, and retrial on the greater offense is barred notwithstanding the jury's deadlock on that charge. ([Pen. Code,] § 1023.) [¶] . . . [W]hen faced with a deadlock on the greater offense and a verdict of guilt on the lesser included offense, the People may prefer to forgo the opportunity to convict the accused of the greater offense on retrial in favor of obtaining a present conviction on the lesser included offense. [Citation.] In that case, the People should move the trial court to exercise its discretion to dismiss the charge on the greater offense in furtherance of justice under section 1385." (*Fields* at p. 311; see also *People v. Romero* (2008) 44 Cal.4th 386, 413, disapproved on other grounds in *Fields, supra,* at p. 305; *People v. Zapata* (1992) 9 Cal.App.4th 527, 533-534.)

---

[2] Rather surprisingly, *Rios* is the only California decision cited in either of appellant's briefs to us.

7

And such, of course, is essentially what happened here: by asking the trial court to instruct the jury with CALCRIM Nos. 500, 570 and 571, instructions the defense did not contest in any way,[3] the prosecution did indeed make voluntary manslaughter one of its theories of culpability. It specifically requested that the trial court instruct the jury with those three instructions, and thus very clearly *did not* embrace any sort of "one theory of culpability" of appellant, i.e., second degree murder, as appellant's briefs repeatedly and erroneously argue.

Also, and as noted above, trial defense counsel effectively agreed with the prosecution's alternative contention—indeed, he closed his argument by stating to the jury that "we're confident your going to find that this was voluntary manslaughter."

We also find no ineffective assistance of counsel, either of the normal sort, or (as appellant's briefs to us contend) such caused by the trial court's agreement to dismiss the second degree murder charge and substitute a specific charge of voluntary manslaughter. As noted above, voluntary manslaughter was: (1) from the beginning, the alternative theory of liability of the prosecution via their request of CALCRIM Nos. 500, 570 and 571; (2) the core theory of appellant's trial counsel regarding appellant's treatment of West; and (3) a theory of liability regarding which the jury was specifically instructed, with absolutely no objection thereto by that counsel.

Citing a huge number of federal cases involving real or asserted Sixth Amendment violations (but as noted above, not key state cases such as *Birks* and *Fields*), appellant asserts that there was "state interference" with the effective assistance of counsel, i.e., actions by the prosecution and the trial court which denied him the effective assistance of counsel, i.e., "court induced" ineffective assistance.

Such was the case, appellant contends, because of the trial court's ruling permitting the amendment of the one-count information to substitute a charge of involuntary manslaughter for the originally-alleged charge of second degree murder.

---

[3] Indeed, trial defense counsel specifically agreed that the court should give CALCRIM Nos. 570 and 571. He had earlier filed his own proposed modified version of No. 570, but apparently abandoned his requested modifications a few days later.

Appellant's argument of the "court induced" denial of effective assistance of counsel is summed up thusly in his rely brief: "Defense counsel made critical tactical decisions throughout trial based on an understanding that Mr. Crandall was charged with second degree murder. Significantly, counsel made the reasonable doubt tactical decision to concede that his client was guilty of voluntary manslaughter in order to avoid a second degree murder conviction. The court's 11th-hour decision to allow the court to instead charge voluntary manslaughter effectively transformed counsel's performance up to that point into effective and devastating advocacy for the state's new theory of culpability."

As demonstrated by our foregoing discussion, this argument totally ignores the fact that voluntary manslaughter *was not* an "11th-hour" charge. Such a charge had been (1) inherent in the prosecution's case from the beginning because of the law of lesser-included offenses, (2) clearly before the jury because of the several instructions noted above directly citing and explaining the lesser included offense of voluntary manslaughter, and (3) reiterated to the jury by the trial court's response to one of the questions it posed to the trial court. Neither the trial court nor the prosecutor interfered with or obstructed defense counsel's right or ability to defend appellant against not only the second degree murder charge but also the lesser included offense of voluntary manslaughter. Put another way, defense counsel was perfectly free, from the beginning of the case to its concluding days, to defend against *both* the specifically charged offense of second degree murder *and* the lesser included offense of voluntary manslaughter.

Instead, and almost surely based on the facts before the jury—especially including the recorded statement of appellant to the police—trial defense counsel clearly made the tactical decision to concentrate 100 percent on defending appellant from a second-degree murder conviction and concede his guilt of the lesser included offense of voluntary manslaughter. Because (1) there was only one count charged in the information, second degree murder, and (2) the jury was clearly split on that charge, under the law as set forth in *Fields* the trial court properly withdrew that charge and substituted in its place a charge of voluntary manslaughter.

9

Because the jury had been properly instructed regarding the elements of that lesser included offense via CALCRIM Nos. 500, 570 and 571, there was no need for the trial court to redefine the offense via CALCRIM No. 572 or otherwise. In his briefs to us, appellant suggests, without ever directly so stating, that once the second degree murder charge was "off the table" the trial court should have instructed the jury with CALCRIM No. 572. But such a request was never made to the trial court, and thus any such contention was waived. (See, e.g., *People v. Bright* (1996) 12 Cal.4th 652, 671, disapproved on other grounds in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.) Trial defense counsel asked only that CALCRIM Nos. 570 and 571 "should be modified" so that the jury would be instructed "that the People have the burden of proving the elements of voluntary manslaughter beyond a reasonable doubt . . . ." But, as the prosecutor and the court both responded, such a burden of proof instruction was already provided the jury via CALCRIM No. 220 and by the last portions of both CALCRIM Nos. 570 and 571. Further, the first sentence of No. 570 specifically advised the jury concerning what was before it—something that jury clearly had no difficulty in finding based on the record before it: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion."

As our Supreme Court has made clear, an appellate court, in reviewing jury instructions, determines "how it is reasonably likely the jury understood the instruction, and whether the instruction, so understood, accurately reflects applicable law." (*People v. Raley* (1992) 2 Cal.4th 870, 899.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; see also *People v. Wilson* (1992) 3 Cal.4th 926, 943; *People v. Crandell* (1988) 46 Cal.3d 833, 874, overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365; *People v. Warren* (1988) 45 Cal.3d 471, 478.) Indeed, these principles were articulated to the jury via CALCRIM No. 200, which stated that it should "[p]ay careful attention to all of these instructions and consider them together." Finally, the jury was also given a

reasonable doubt instruction (CALCRIM No. 220), an instruction which, as noted, necessarily encompassed not only the crime specifically charged in the original information but also its lesser included offenses.

In any event, even if the act of removing the one charged count of second degree murder and substituting in an express count of voluntary manslaughter was somehow procedurally erroneous, such was clearly harmless error. Everyone, including defense counsel, clearly thought—and very reasonably so based on appellant's statements to the police—that he was guilty of voluntary manslaughter.

## IV. DISPOSITION

The judgment of conviction is affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.