Filed 9/13/13  P. v. Flores CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EFREN FLORES,<br><br>    Defendant and Appellant. | B241530<br><br>(Los Angeles County<br>Super. Ct. No. NA086309) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Arthur Jean, Jr., Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Efren Flores (defendant) guilty of first degree murder and two counts of attempted murder. On appeal, defendant contends that there was insufficient evidence to support the guilty verdicts, his trial counsel provided ineffective assistance of counsel by failing to object to certain hearsay statements of a former codefendant, and the trial court erred by failing to instruct the jury sua sponte on accomplice liability. Defendant also challenges his sentence under the gun-use enhancement on the grounds that it violates California's multiple conviction rule and principles of double jeopardy.

We hold that there was substantial evidence in support of the jury verdicts, the claimed ineffective assistance of counsel was not prejudicial, and the claimed instructional errors were not prejudicial. We further hold that defendant's challenges to his sentence under the gun-use enhancement are without merit. We therefore affirm the judgment of conviction.

# FACTUAL BACKGROUND

## A.     Prosecution's Case

On the morning of September 14, 2009, Carlos Garcia[1]—a member of defendant's and former codefendant Jesus Gonzales's[2] Westside Longo gang—walked to a liquor store at the corner of 20th Street and Pacific Avenue in Long Beach to buy cigars. After he left the liquor store, Garcia had a confrontation with African American and Hispanic

---

[1]     Because the trial court found that Garcia was unavailable to testify, the prosecution introduced his preliminary hearing testimony at trial.

[2]     Garcia knew defendant by the nickname "Grouchy" and Gonzales by the nickname "Chuyito" or "Little Chewy." Gonzales was charged in the same information as defendant, but his case was severed prior to trial.

members of the 18th Street gang. As he crossed the street from the liquor store parking lot, a van pulled up and the two Hispanic males sitting in the front "started throwing up 18" gang signs.[3] In response, Garcia "threw up West Side Longo" gang signs. Garcia continued walking, but several African American and Hispanic gang members exited the van and began walking toward Garcia. In response, Garcia made a motion, as if he was carrying and about to produce a gun, and then kept walking home.

On the evening of September 14, 2009, at around 10:30 p.m., James Gaither, an African American, was sitting on the stairs outside his apartment complex with his African American friends David and Robert Tripplet.[4] Gaither was sitting at the top of the stairs, Robert was located at the middle of the stairs, and David was at the bottom. As Gaither and David were text messaging and Robert was listening to his Ipod, two Hispanic males walked up to the group. Gaither did not notice the two men until one of them starting talking. He heard the words "where you from" and suspected that there was going to be trouble. David responded, "we don't' bang. We aren't from nowhere," trying to calm the situation. The same Hispanic male then said, "Fuck Crabs, fuck Crabs, where you from. Fuck Crabs. Where you from."[5] Based on those statements, Gaither became certain that "something was about to happen" and he "froze."

The male Hispanic who had done all the talking, and who Gaither identified at trial as defendant, seemed intoxicated, but the other Hispanic male did not. The other male Hispanic "grabbed" defendant, as if the two were about to leave. Just as the other male Hispanic was pulling defendant away, defendant produced a gun from his pocket, pointed at David, and began shooting. Gaither heard gun fire and saw David, who had been standing, fall to the ground.

---

[3]     Garcia considered anyone who threw 18th Street gang signs at him as an enemy.

[4]     To avoid confusion, the Tripplet brothers will be referred to by their first names.

[5]     Gaither understood the term "Fuck Crabs" to be an expression of disrespect toward Crip gangs. Crip gang members in Long Beach were predominantly African American or Asian.

Gaither turned and tried to "get in the house," but before he could open the door, he was shot in the hand as he reached for the door knob.[6] As he turned around to check on David and Robert, Gaither saw defendant and the other Hispanic male running away. Then he saw Robert "sliding down the stairs, bumping his head as he was going down." Gaither grabbed Robert, turned him over, and started shaking him. Robert's eyes were closed and he was "snoring like he was asleep." Gaither kept shaking Robert and "screaming his name trying to wake him up." David stood up and told Gaither he was going into the house to "get a towel to put on his wounds." Gaither noticed that David had been shot in the face and "somewhere else," but he was not focused on David because he knew David was "alive and talking."

David testified that on September 14, 2009, at around 10:00 or 10:30 p.m., he had just returned to his apartment from the store with his brother Robert and his friend Gaither. He was standing at the bottom of the apartment building's stairs, Robert was sitting in the middle of the stairs, and Gaither was sitting at the top of the stairs. According to David, "[t]wo [Hispanic] guys walked up and started banging on [David, Robert, and Gaither] asking [them] where [they] were from." David replied, "No. We don't bang." The male Hispanic who asked where the men were from responded by saying, "Fuck Crabs" two times.[7]

The male Hispanic who had been speaking, and who David identified at trial as defendant, then pulled out a gun and pointed it at David's face from three or four feet away. David put up his hands, but defendant "started shooting." David felt pain in his face, turned, was shot again in the back, and fell to the ground.

David continued to hear gun shots, as many as four or five. When he stood up, he saw Robert lying on the stairs. Robert was not moving, so David went to him to determine if he was breathing. After David determined that Robert was still breathing, he

---

[6]     Gaither received stitches in his hand at the hospital.

[7]     David understood the term "Fuck Crabs" to mean "Fuck Crips."

4

went into the house to retrieve a towel and when he came out, the police had arrived. An ambulance took David to the hospital where he stayed for a week to receive treatment and care for bullet wounds to the face, shoulder, and back. At the time of trial, David was still experiencing back pain from his wounds.

Robert was transported to the hospital where he died. The deputy medical examiner who performed the autopsy on Robert found a single, fatal gunshot entry wound beneath the right eye. The bullet passed through the brain and was recovered from inside the skull cavity.

According to subpoenaed telephone records, defendant called Garcia at approximately 10:55 p.m. the night of the shootings. Garcia, who lived near the scene of the shooting, said defendant asked him if he had heard any gunshots. When Garcia replied in the negative, defendant asked him if there were police outside. Garcia went outside his apartment and confirmed to defendant that there were police near the intersection of 20th Street and Cedar Avenue. Defendant then told Garcia that he had "laid down some Crabs," which Garcia understood to mean defendant had shot some Crips gang members. Garcia responded "all right then, whatever" and terminated the call.

The next day Garcia walked to defendant's house and spoke to him about the shootings the night before. Defendant told Garcia that he and Gonzales had been at a bar watching a Raiders game on the night of the shootings. The two men, who were drunk, walked from the bar down 20th Street where they saw some Crips gang members. Defendant and Gonzales pretended to be more drunk than they were, "acting like they couldn't walk that good."

As defendant and Gonzales approached the three Crips gang members, one of the three walked down the stairs, and defendant began to argue with him. According to Garcia, "Grouchy hit [the three black Crips gang members] up. And then one of the Crips said he 'didn't bang,' but he said, 'Cuz' at the end. When he said that, that's when Grouchy just started shooting at them." After the shooting, defendant and Gonzales ran away.

5

City of Long Beach Police Detective Todd Johnson was one of the officers assigned to investigate the shootings of Robert, David, and Gaither. He arrived at the scene of the shootings after midnight. Officers at the scene had already recovered two bullet fragments.

During the course of his initial investigation, Detective Johnson developed information suggesting that Robert may have been involved in an altercation earlier on the day of the shooting. That information, in turn, caused Detective Johnson to investigate Garcia. A Crip's gang member informed the detective that a Hispanic male with a "W" on his hat had been involved in an incident at a liquor store on the corner of 20th Street and Pacific Avenue. A video surveillance tape from the store showed Garcia, as well as a group of men who "'banged'" on Garcia. When Detective Johnson attempted to contact Garcia, he learned that Garcia had been arrested on a probation violation. During a search of Garcia's residence, the detective recovered a hat with a "W" on it.

Detective Johnson next assembled photographs of eight different Hispanic males, one of which was a photograph of Garcia. The detective showed the photographs to David and Gaither, but neither of them identified Garcia as being involved in the shootings.

Because Detective Johnson suspected that Garcia knew something about the shootings, he went to his residence and brought him back to the police station for questioning. Garcia initially denied any involvement in the shootings, but after further questioning, he admitted that "Drowsy" had called him and told him that "Little Chucky" from the West Side Longo gang did the shooting with "Chuyito's" older brother.

Detective Johnson knew Drowsy's telephone number and reviewed records for it, but did not find any telephone calls from Drowsy to Garcia during the relevant time frame. As a result, he interviewed Garcia a second time. During that second interview, Garcia told the detective that "Clover" did the shooting. When Detective Johnson investigated Clover, he learned that he was Don Gonzales, the brother of Gonzales and a West Side Longo gang member. But when he attempted to locate Clover, the detective discovered that he had been incarcerated for immigration related reasons.

6

Based on the information he obtained on Clover, Detective Johnson and his partner, Detective William Mutsubara, interviewed Garcia a third time, and the latter portion of that interview was tape recorded. During the recorded portion of the interview, which was played for the jury, Garcia provided, inter alia, the "real story." Garcia admitted that the first version of the shootings that he told the detectives was not true, and then he explained to the detectives that he learned about the shootings from defendant in a telephone conversation the night of the shootings. Defendant telephoned Garcia and asked if there were police outside Garcia's apartment. Garcia went outside and informed defendant that he saw the police. In response, defendant said "Yeah, I just laid down some crabs . . . ."

The next day Garcia went to defendant's house and defendant provided details of the shootings. According to defendant, he and Gonzales left a bar after watching a Raiders game and as they were walking and acting like they were drunk, they saw "three crabs right there where [Garcia] live[d] . . . ." One of the men came down the stairs toward defendant who told the men "where he was from." When the man said, "Oh, we don't bang cuz" defendant "stepped back and he said fuck crabs and he started shooting at them and . . . both Chuyito and Grouchy started running away."

Garcia informed the detectives that he also spoke to Gonzales after the shootings. Gonzales's version of the shootings was substantially similar to the version defendant had given Garcia. According to Gonzales, he and defendant were coming back from watching a Raiders game, walking near Garcia's residence. Gonzales and defendant were acting as if they were drunk, holding on to one another. The two men "went up to the three black guys that live[d] right there upstairs . . . ." Defendant "hit them up" and told them "where he was from . . . ." One of the African American males responded "oh we don't bang cuz" and then defendant "stepped back and . . . just started shooting at them and . . . [Gonzales and defendant] started running."

In addition to recounting his conversations with defendant and Gonzales about the shootings, Garcia told the detectives about the incident at the liquor store that occurred earlier on the day of the shootings. That morning, Garcia went to Eddie's liquor store on

7

20th Street and Pacific Avenue to buy some cigars. As he was walking home, a burgundy van pulled into the parking lot of the liquor store and a male in the front passenger seat "[threw] up 18," causing Garcia to "throw up Longo at him . . . ." Some Mexican males and two African American males emerged from the van and began walking toward Garcia. In response, Garcia "grabbed [his] little pocket knife from [his] key chain and then [he] acted [as] if [he] had a gun or something."

Following the detectives' third interview with Garcia, they asked him to make "pretext" phone calls to defendant in an effort to obtain an admission to some type of involvement in the shootings. The calls were made over a two-day period in April 2010. In July 2010, Detective Johnson interviewed defendant's girlfriend, Marisa Gallegos, who informed him that defendant had "concerns about the security of his phone . . . ." Using a wire tap on defendant's telephone, the detectives heard several phone conversations between Gonzales and defendant. They determined that after Garcia would make pretext calls to defendant, Gonzales would receive calls from defendant.

Using their drivers license pictures, Detective Johnson created "flyers" with sketched faces of Gonzales and defendant. Police officers walked around neighborhoods passing out the flyers and speaking with residents. They targeted neighborhoods around the scene of the shootings. They also passed the flyers out in the territory of the Westside Longo gang. In addition, they posted the flyers on every front door of defendant's apartment complex, including defendant's front door. The flyers stimulated "phone traffic" between Gonzales and defendant.

Detective Johnson learned from defendant's girlfriend, Gallegos, that after the flyers were passed out, defendant and Gallegos switched telephones. One text message from Gallegos's telephone that the detectives intercepted read, "Crab killa gang ain't no other way for this longerothang, woopty, woop, woop, weeesst brackkking blood."

City of Long Beach Police Detective Sean Magee, who was assigned to the gang investigations unit as a gang detective, testified as the prosecution's gang expert. He was familiar with the Westside Longo gang which had a gang injunction issued against its members. The Westside Longo gang had approximately 300 members of which

8

approximately 100 members were active.  The gang claimed the area of Long Beach west of the Los Angeles riverbed.  The scene of the shootings in this case was located in a disputed territory claimed by several gangs other than the Westside Longo gang.  The Westside Longo gang utilized Oakland Raider football team colors—silver and black.  They also had distinctive hand signs.

The primary activities of the Westside Longo gang were murders, attempted murders, manslaughters, assaults with deadly weapons, robberies, and illegal distribution of narcotics, particularly methamphetamine.  Garland White and Eric Benites were Westside Longo gang members.  White was convicted of manslaughter in 2005 and Benites was convicted of assault with a deadly weapon in 2008.

Detective Magee knew that defendant was a Westside Longo gang member based on his tattoo and gang graffiti recovered from his room, including graffiti that stated, "Grouchy, Longo Beach Crab killing gang."  Defendant's nickname was Grouchy.  The term "Crab" was a disrespectful reference to a member of a Crips gang.  The Crips in Long Beach were predominately African American or Asian.

Detective Magee also knew that Gonzales was a Westside Longo gang member based on Gonzales's admissions of gang membership, his tattoos, conversations with Detective Johnson, and surveillance of Gonzales during the investigation of the shootings in this case.  His nickname was Chuyito.

Detective Magee was familiar with the facts of this case.  Based on a hypothetical question premised on facts that closely mirrored the facts of this case, he opined that the shootings in the hypothetical case were committed for the benefit of, at the direction of, and in association with a criminal street gang and were committed with the intent to promote, further, and assist gang members in their criminal activities.  He based his opinion on several factors.  The shooter's use of the phrase "Where are you from" was a challenge to enemies and the term "Fuck Crabs" was consistent with the Westside Longo gang because they were "notoriously racist."  Also, the shootings appeared to be part of a plan which was carried out by two Westside Longo gang members who "witnessed [each] other" so they could "brag about [the shootings] to others" and verify that the

9

shootings did occur. The shootings heightened the perpetrators reputation as killers and would "strike fear" in any potential witnesses. When gang members were able to instill fear in a community, it made it easier for gang members to "run a neighborhood" and commit crimes, such as illegal narcotics sales. By instilling such fear in a community, the gang members had a greater ability to control the streets they claimed for their gang.

### B.    Defense Case

The defense called as a witness an expert on eyewitness identifications. The expert testified about various issues associated with eyewitness identifications, including reliability. According to the expert "sometimes [eyewitnesses] get it right and sometimes they get it wrong."

## PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant in count 1 with the murder of Robert in violation of Penal Code section 187, subdivision (a)[8]; in count 2 with the attempted murder of David in violation of sections 664 and 187, subdivision (a); and in count 3 with the attempted murder of Gaither in violation of sections 664 and 187, subdivision (a). The District Attorney alleged that all three counts were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). The District Attorney also alleged as to all three counts that defendant personally used a firearm, personally discharged a firearm, and personally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivisions (b), (c) and (d). In addition, the District Attorney alleged that a principal personally discharged a firearm

---

[8]    All further statutory citations are to the Penal Code, unless otherwise indicated.

10

causing great bodily injury or death within the meaning of section 12022.53, subdivisions (d) and (e)(1).

Following trial, the jury found defendant guilty on all three counts and, as to all three counts, found true the allegations that defendant personally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d); a principal personally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivisions (d) and (e)(1); and defendant committed the charged crimes for the benefit of, at the direction of, and/or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). The trial court sentenced defendant to an aggregate sentence of 130 years to life comprised of a term of 25 years to life on count 1, plus an additional consecutive 25 years to life term pursuant to section 12022.53, subdivision (d), for a total sentence of 50 years to life on count 1; an additional consecutive term of 15 years to life on count 2, plus an additional consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d), for a total sentence on count 2 of 40 years to life; and an additional consecutive term of 15 years to life on count 3, plus an additional consecutive 25 years to life term pursuant to section 12022.53, subdivision (d), for a total sentence on count 3 of 40 years to life.

## DISCUSSION

### A.    Substantial Evidence

#### 1.    *Standard of Review*

Defendant's challenge to the sufficiency of the evidence in support of the jury's guilty verdicts on the first degree murder of Robert and the attempted murders of David and Gaither is governed by the substantial evidence standard of review. "In assessing . . . a claim [of insufficient evidence], we review the record 'in the light most favorable to the

11

judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) 'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618] (*Rodriguez*).) [¶] Moreover, as observed in *Rodriguez*: 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) '"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.*'" [Citations.]'" [Citation.]' (*Rodriguez, supra*, 20 Cal.4th at p. 11, italics added; see generally *People v. Clark* (2011) 52 Cal.4th 856, 942-943 [131 Cal.Rptr.3d 225, 261 P.3d 243] (*Clark*), and cases cited.)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.)

### 2.     *Analysis*

Defendant contends that there was insufficient evidence to support a finding that he was present during the shooting, much less a finding that he was the shooter. According to defendant, the eyewitness identifications of defendant as the shooter made

by David and Gaither were unreliable, as were Garcia's preliminary hearing testimony and recorded statements about his conversations with defendant and Gonzales.

Both David and Gaither, who were victims of the shootings, unequivocally identified defendant as the shooter in open court. The jury heard their testimony and observed their demeanor, and was therefore entitled to give it credence. David was standing within three to four feet of the shooter and Gaither was at the top of the stairs looking down at the shooter at the bottom of the stairs. Given the proximity of both men to the shooter as he spoke prior to firing his handgun, they had ample opportunity to observe the shooter, a fact on which the jury was entitled to rely in evaluating the veracity and reliability of the witnesses' identifications. Under the substantial evidence standard discussed above, the identification testimony of either David or Gaither, by itself, was sufficient to support the jury's findings that defendant was present during the shootings and that he was the shooter. Therefore, because there was not one, but two eyewitness identifications, substantial evidence supported the verdicts.

In addition to the eyewitness identifications, the jury heard Garcia's preliminary hearing testimony which was made under oath and subject to cross-examination. The jury also heard the recorded statement that Garcia gave to the detectives that substantially corroborated his preliminary hearing testimony. Based on that evidence, the jury was presented with admissions by defendant and Gonzales that defendant was the shooter. Although any one of those admissions, by itself, would have been sufficient to support the jury's verdicts, when they each are considered together with the eyewitness identifications, they clearly supported a reasonable inference that defendant was the shooter.

**B.    Ineffective Assistance of Counsel Based on Trial Counsel's Failure to Object to Certain of Gonzales's Out-of-Court Statements to Garcia**

*1.    Background*

Prior to trial, the prosecution filed a motion to introduce at trial certain out-of-court statements made by defendant and Gonzales.  According to the motion, the night of the shooting, defendant called Garcia and admitted he was the shooter.  The next day, defendant made more detailed statements to Garcia concerning his involvement in the shootings.  The prosecution's motion also stated that on the evening the flyers with sketches of defendant and Gonzales were posted, Gonzales told his girlfriend that he and defendant did the shooting.  In support of the motion, the prosecutor argued that both defendant's statements to Garcia and Gonzales's statements to Hernandez were admissible as nontestimonial admissions against penal interest.

At the hearing on the motion, the trial court and the prosecutor had the following exchange:  "The Court:  So you intend to call [Gonzales's girlfriend] Maria Hernandez.  And she is going to testify that Mr. Gonzales said that [defendant] was part of this murder?  [¶]  [Prosecutor]:  Correct.  [¶]  The Court:  And that's hearsay.  [¶]  [Prosecutor]:  Under *Cervantes* and *Greenberg* the People would still argue--  [¶]  The Court:  But this isn't contravention of *Crawford*.  It is one thing for Hernandez to say Gonzales [said] that he did it.  That's a declaration against [Gonzales's] penal interest.  But the declaration that [defendant] did it too is not a declaration against [Gonzales's] penal interest.  It is a separate issue.  [¶]  [Prosecutor]:  [The] People would argue under *Greenberger* and *Cervantes* if the declaration is against the person that not only makes the statement and you find that he is not exposing his co-defendant in a situation like that, to exposure, saying that I was there, he is the one that shot, it is inherently reliable.  And it should be allowed.  [¶]  The Court:  But the statement that [defendant] did it is not a declaration against [Gonzales's] penal interest.  [¶]  [Prosecutor]:  It exposes him to the same amount of culpability as it does defendant Gonzales.  [¶]  The Court:  But it is not a declaration against penal interest.  Gonzales saying I was there and [defendant] was too

14

and we both did it, the part that he was there and he did it, is a declaration against [his] penal interest. But that [defendant] did it is not a declaration against [Gonzales's] penal interest. And Gonzales isn't here to be cross-examined. So I don't think it comes in. [¶] [Prosecutor]: That's fine. [The] People submit on that."

Although there was discussion at the hearing about Gonzales's statement to Hernandez implicating defendant as the shooter, there was no discussion of Gonzales's similar statement to Garcia implicating defendant as the shooter, which statement was contained in the tape-recorded interview of Garcia. At trial, the prosecution did not call Hernandez, presumably because of the trial court's ruling set forth above. But without any objection from the defense, the tape recording of Garcia's interview with the detectives was played for the jury, including Garcia's statement that Gonzales told him defendant was the shooter.

### 2. *Applicable Legal Principles*

Defendant concedes that he forfeited on appeal his claim that the trial court erroneously admitted Gonzales's statements to Garcia implicating defendant as the shooter by failing to object to the relevant portion of Garcia's tape recorded interview with the detectives. Nevertheless, defendant argues that he received ineffective assistance of counsel based on his trial counsel's failure to object.

"'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."' (*People v. Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169], quoting *Strickland v. Washington* [(1984)] 466 U.S. [668,] 686.) Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Thompson* (2010) 49 Cal.4th 79,

15

122.) "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212] quoting *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. (*People v. Wilson*, *supra*, at p. 936; *People v. Pope*, *supra*, at p. 426.)" (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

### 3. *Analysis*

Assuming, without deciding, that defendant's trial counsel provided ineffective assistance of counsel by failing to object to the relevant portion of the tape recorded interview of Garcia, any such error was harmless. As discussed above, in addition to Gonzales's statement to Garcia implicating defendant as the shooter, the two surviving shooting victims identified defendant at trial as the man who shot them. And defendant himself admitted to Garcia in two separate conversations that he was the shooter. Garcia testified at the preliminary hearing and was subject to cross-examination by defendant's counsel. Thus, notwithstanding defendant's contentions as to Garcia's reliability, the additional statement by Gonzales implicating defendant as the shooter was, at best, cumulative corroborating evidence. Therefore, trial counsel's failure to object to that statement cannot be said to have so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. (See *People v. Thompson, supra,* 49 Cal.4th at p. 122.) To the contrary, given all of the other substantial evidence in support of the finding that defendant was the shooter, it was not reasonably probable that defendant would have obtained a different result at trial if Gonzales's statement to Garcia had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Similarly, given the nature and quality of the other evidence showing that defendant was

16

the shooter, a reasonable juror could have found defendant guilty of the charged crimes beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### C.  Jury Instructions

Defendant contends that the trial court failed to fulfill its sua sponte duty to give appropriate jury instructions on accomplice liability under section 1111 concerning Gonzales's statements to Garcia implicating defendant as the shooter.  But, as defendant concedes, the California Supreme Court has held that a trial court's failure to instruct on accomplice liability is harmless error if there is sufficient corroborating evidence.  (See *People v. Lewis* (2001) 26 Cal.4th 334, 370.)

Here, as defendant also concedes, there was sufficient corroborating evidence concerning Gonzales's statements to Garcia implicating defendant as the shooter, including defendant's own admissions against interest that he was the shooter. Notwithstanding the holding in *People v. Lewis, supra*, 26 Cal.4th 334, defendant urges us to reconsider the issue and hold that the claimed instructional error was prejudicial. Because we are bound by the holding in that Supreme Court case (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), we must follow it and conclude that the claimed failure to instruct on accomplice liability was harmless.

### D.  Multiple Conviction Rule and Double Jeopardy Principles

Defendant contends that the imposition of a section 12022.53, subdivision (d) firearms enhancement on a defendant convicted of murder violates the multiple conviction rule set forth in *People v. Ortega* (1998) 19 Cal.4th 686, 692-694 and *People v. Pearson* (1986) 42 Cal.3d 351, 355-360, as well as federal constitutional principles of double jeopardy.  According to defendant, the factual element essential to establishing the section 12022.53, subdivision (d) enhancement—discharge of a firearm causing death—

17

is necessarily subsumed within the elemental components of murder—proximately causing the death of the victim.

Defendant concedes, as he must, that two California Supreme Court decisions have rejected his contention under California's multiple conviction rule. (*People v. Sloan* (2007) 42 Cal.4th 110, 115-125 and *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134.) Because we are bound by those decisions under *Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at page 455, we reject defendant's contention that his punishment violated California's multiple conviction rule.

Defendant also concedes that, historically, federal double jeopardy has not applied to multiple punishment within a unitary trial, but contends that recent United States Supreme Court decisions "suggest" that it now should. Again, because there is California Supreme Court and United States Supreme Court authority holding that multiple criminal punishments that arise out of a unitary criminal proceeding do not implicate federal double jeopardy principles, *People v. Sloan, supra,* 42 Cal.4th at page 121, *Hudson v. United States* (1997) 522 U.S. 93, 99, we are bound to follow that authority and reject defendant's double jeopardy contention.

**DISPOSITION**

The judgment of conviction is confirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KUMAR, J.

18