Filed 2/5/16  P. v. Ashurst CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JAMES ASHURST,<br><br>    Defendant and Appellant. | H040995<br>(Monterey County<br>Super. Ct. No. SS131139) |

Defendant Robert James Ashurst appeals from a judgment of conviction entered after a jury found him guilty of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a) – count one), possession of a controlled substance while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a) – count two), felony vehicular evasion of a peace officer with willful disregard for the safety of others (Veh. Code, § 2800.2, subd. (a) – count three), and possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)[1] – count four). The jury also found that defendant was armed with a firearm in the commission of count three (§ 12022, subd. (a)(1)). In a bifurcated proceeding, defendant admitted the allegations that he had two prior strike convictions (§ 1170.12, subd. (c)(2)) and he was ineligible for a jail sentence pursuant to section 1170, subdivision (h)(3).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

After granting defendant's *Romero*[2] motion to strike one prior serious felony conviction, the trial court sentenced defendant to ten years eight months in prison. The trial court imposed: (1) the upper term of four years for possession of a controlled substance while armed (count two) and doubled that term to eight years; and (2) one year and four months each for vehicular evasion (count three) and possession of a firearm by a felon (count four). The trial court stayed the one-year enhancement attached to count three and the upper term of three years for possession of a controlled substance (count one) pursuant to section 654.

On appeal, defendant contends: (1) the trial court erred when it denied his *Pitchess*[3] motion; (2) the trial court abused its discretion when it excluded evidence of a prosecution witness's prior dishonesty; (3) and the trial court erred in denying his motion to stay his punishment for count four.[4] We conclude that the judgment must be modified to stay punishment for the possession of a firearm by a felon count. As modified, the judgment is affirmed.

## I. Statement of Facts

At about 2:00 a.m. on April 22, 2013, Sergeant Brian Pickens was parked in a turnout and monitoring traffic just outside the City of Marina. He saw a dark-colored sedan drive by with two Vehicle Code violations: there was no front license plate or registration on the windshield; and all the windows were tinted. Pickens decided to conduct a traffic stop, positioned his patrol car behind the 2001 Infiniti, and turned on the overhead lights. After the driver failed to yield after 250 to 300 yards, Pickens activated

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).
[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).
[4] Defendant also argued that there was a clerical error in the abstract of judgment. The error has since been corrected.

2

the patrol car siren. The driver continued and ignored a red light at an empty intersection. Pickens broadcast his pursuit on his police radio.

The driver made a left turn onto Ready Court, "abruptly" pulled over, and left the engine running. Pickens stopped his patrol car behind the Infiniti and activated the patrol car spotlights into the open driver's window. Pickens, who was wearing his sheriff's uniform, drew his service revolver, exited his patrol car, and shouted to the driver to shut off the engine. Pickens also illuminated the driver's side window with his flashlight. Pickens was about 20 to 25 feet from this window when the driver looked at him and said, "You can't pull me over for nothing." Pickens identified defendant as the driver. As Pickens spoke to defendant, Pickens observed that defendant had a "big black birthmark or mole on his left cheek."

Pickens told defendant again to shut off the engine. Defendant said "something to the effect of, 'Oh, let me guess. You're going to shoot me now.' Or, 'You can't shoot me now.'" At this point, defendant put the car into gear and drove away. Pickens returned to his patrol car, resumed the chase, and broadcast a description of the driver as "a black male adult with a du rag."

Defendant went through another red light at Imjin Street while Pickens was 30 to 40 yards behind him. After defendant turned onto Reservation Road and headed towards Marina, he was weaving between lanes. At the Del Monte intersection, defendant ran a red light.

When defendant turned onto Lake Drive, Pickens performed a "PIT" stop and drove into the rear side of the Infiniti to cause a spin-out. However, defendant's car did not stall. Instead, the Infiniti spun 180 degrees and accelerated down another residential street. As the pursuit continued, Pickens was joined by two Marina Police patrol cars.

Defendant turned onto Debbie Lane, a dead-end street, and stopped just to the left of 191 Debbie Lane. Defendant exited the driver's door and ran toward a wooden fence.

3

As defendant ran, he had his right wrist anchored to his front right waistband area. Pickens was concerned that defendant had a firearm. When defendant reached the fence, he scaled it.

As Pickens attempted to follow defendant, a woman, who was wearing only a T-shirt, ran out of the residence at 191 Debbie Lane and got between defendant and Pickens. Officer Richard Moreno arrived as the driver of the vehicle ran toward the fence. Moreno knew that defendant lived at the Debbie Lane residence. When Moreno tried to climb over the fence after defendant, his ankle or foot became stuck and he fell on his shoulder. Meanwhile, Pickens told the woman several times to step away from Infiniti and return to her residence. She left, but returned after putting on more clothing. The woman initially provided a fake name and tried to get into the Infiniti. Pickens eventually learned that her name was Rosie Travis.

When Pickens learned from Moreno that defendant lived at 191 Debbie Lane, he asked the dispatcher to e-mail him a photograph of defendant. Pickens immediately recognized defendant as the driver of the Infiniti when he saw the photograph.

Pickens searched the car and found several items that linked defendant to the Infiniti: a California identification card with defendant's name and date of birth, a Visa debit card in defendant's name, an envelope addressed to defendant, and a speeding ticket issued to defendant. Pickens also found a small canister containing suspected powdered cocaine as well as a Kindle Fire.

Pickens had been at the scene for 45 to 50 minutes when he searched Travis's cell phone and read text messages between Travis and "papa bear." Pickens concluded that defendant was "papa bear." Defendant sent a text message at 2:29 a.m., which said: "Say the Kindle Fire is yours and try to get the computer back." At 2:30 a.m., he sent another text message: "Say the iPad is your sister's." Travis replied, "K. Erase MGS." At 2:30 a.m., defendant texted: "Are they still there?" The response was "Ye." About

4

six minutes later, Travis sent a text, which stated: "Still outside. Ugo ur handle." Defendant texted a response about two minutes later, "Huh." At approximately 2:41 a.m., defendant sent a text: "Just make sure you get the Kindle and tell my dad to say that's his computer bag. And it is." At about 2:55 a.m., he texted "What are they doing? Did they find the guy driving my car?"

Shortly after the last text, Travis told Pickens that the Infiniti was her car and she wanted to report it as stolen. Pickens laughed at her, because "typically when a car is involved in something criminal, a lot of times the people who own the vehicle know to report the car stolen because it will throw suspicion elsewhere as far as it from being on them." Pickens told Travis that defendant had stopped during the pursuit and Pickens had seen him driving the vehicle. She responded, "Oh, I didn't know that."

Officer Terrell Bailey arrived at the scene with his police dog. The dog followed a scent from the wooden fence and displayed interest in "something up high" on the carport. Moreno retrieved a .380 semiautomatic pistol in a holster on roof of the carport. The handgun had a clip containing five bullets and appeared operable. No debris surrounded the handgun, which indicated that it had been recently left there.

When Pickens was in court for the preliminary hearing in defendant's case, defendant was seated in the jury box. As Pickens passed by defendant, defendant stared at him and said, "Fucking punk." It was stipulated that no one else heard defendant make this statement to Pickens.

The parties stipulated that defendant had a prior felony conviction within the meaning of section 29800, subdivision (a)(1). They also stipulated that Officer Jorge Alvarado would testify that on February 11, 2009, he searched defendant, who possessed a bindle of a white powdery substance that he admitted contained cocaine. By stipulation, the parties agreed that Rachel Frase, a criminalist, would testify that she

5

examined the suspected contraband in November 2013 and found that it weighed .16 grams, tested positive for cocaine, and was a usable amount.

## II. Discussion

### A. *Pitchess* Motion

Defendant contends that the trial court erred when it denied his *Pitchess* motion on the ground that he had failed to establish good cause.

### 1. Background

Defense counsel filed motion for discovery of Pickens's personnel records. The motion sought the disclosure of any complaints that alleged any acts of dishonesty or falsifying information and acts of moral turpitude. Trial counsel also submitted a declaration that stated in relevant part: "2. Defendant was arrested, for an incident that took place on April 22, 2013. True and correct copies of the Monterey County Sherriff's Police reports are attached hereto as Exhibit A. [¶] 3. I am informed and believe that the identification that is alleged to have been made by Deputy of Defendant, the identification that is noted in the third paragraph of page 2 in Exhibit A, did in fact not take place. [¶] 4. I am informed and believe that Deputy Brian Pickens fabricated facts and evidence to implicate Defendant in this alleged offense. [¶] 5. I am informed and believe that Defendant was not driving the vehicle in the manner discussed in the Monterey County Sherriff's reports that are attached. [¶] 6. I am informed and believe that at a trial on the facts described in the Monterey County Sherriff's report the character, habits, customs and credibility of Deputy will be a material and substantial issue. [¶] 7. I am informed and believe that the Monterey County Sheriff's Office 24 (hereafter the 'Sherriff') makes, maintains, and keeps written records concerning its

6

deputies, including but not limited to, complaints received by the Department regarding its officers."[5]

Following argument, the trial court denied the *Pitchess* motion: "THE COURT: All right. At this time, Mr. O'Keefe [deputy public defender], I agree with Mr. Grant [deputy county counsel]. I don't think -- I think this case is just him saying I -- it didn't happen and he's lying, and there isn't any alternative factual scenario that's been presented that, I think, shows that there is sufficient information to establish good cause for the request or the materiality. The materiality is not -- I mean, that's not the main issue, but it's just standing there and saying it didn't happen, he's lying, I don't -- I just don't think that's sufficient. So the motion, at this point, is denied. [¶] MR. O'KEEFE: Just -- [¶] THE COURT: Do you have a future date already? [¶] MR. O'KEEFE: Just so that I'm clear as to the denial, is the denial based upon the fact that my client states that he was not the driver of the vehicle, saying that that factual scenario is not plausible, or is it that it's not enough? [¶] THE COURT: I don't think that it's sufficient to rise to the level to establish the good cause. I think that is comparable to the cases that just say, the cop's lying. I didn't do it."

Defense counsel later stated that he had received information from the prosecution that might aid him in filing an amended declaration to the *Pitchess* motion and requested to set the matter for another date. The trial court scheduled a hearing on the amended motion on December 18, 2013. Defense counsel did not file an amended declaration and the clerk's minutes for December 18, 2013, did not indicate that an amended *Pitchess* motion was heard.

---

[5]     The third paragraph on page 2 of the police report prepared by Pickens states: "I returned to my car and advised county communications that the driver of the vehicle was again attempting to evade me. I put the male's description out as a black male adult wearing a black 'dew rag.' It is interesting to note while talking to the driver, I noted what appeared to be a large, black birthmark on his left cheek. This cheek was turned towards me as the driver shouted at me."

7

## 2. Analysis

A criminal defendant has a limited right to discovery of law enforcement officer personnel records. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; Evid. Code, §§ 1043-1045.) "To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue. [Citation.] This two-part showing of good cause is a 'relatively low threshold for discovery.' [Citation.]" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*).)

Establishing "good cause" requires the defendant to "propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick*, *supra*, 35 Cal.4th at p. 1024.) Defense counsel's "affidavit must also describe a factual scenario supporting the claimed officer misconduct." (*Ibid.*) In some cases, this affidavit "may consist of a denial of the facts asserted in the police report." (*Id.* at pp. 1024-1025.) However, in other cases, the trial court "determines whether defendant's averments, '[v]iewed in conjunction with the police reports' and any other documents, suffice to 'establish a plausible factual foundation' for the alleged officer misconduct and to 'articulate a valid theory as to how the information sought might be admissible' at trial. [Citations.] . . . . What the defendant must present is a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents. [Citations.]" (*Id*. at p. 1025.) A factual scenario is "'plausible'" if it is one that "might or could have occurred." (*Id.* at p. 1026.)

8

After the defendant has shown good cause for the discovery, the trial court reviews the relevant documents in chambers to determine which documents meet the relevant statutory standards.  (*Warrick*, *supra*, 35 Cal.4th at p. 1027.)

A trial court's ruling on a *Pitchess* motion is reviewed for abuse of discretion. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.)

Here, defendant did not establish sufficient good cause for the requested discovery.  The declaration failed to state a proposed defense or to establish a link between any defense and the charges against defendant.  While defendant raised mistaken identity and third party culpability defenses at trial, the declaration did not identify these defenses.  Moreover, the declaration did not "describe a factual scenario" which supported the alleged misconduct by Pickens that was plausible when read in light of the police report.  Merely stating in the declaration that Pickens's identification of defendant "did not take place" and defendant "was not driving the vehicle in the manner discussed" was insufficient given several other facts set forth in the police report which supported Pickens's identification of defendant as the perpetrator of the charged offenses.  Those facts included:  Pickens conducted a traffic stop involving a car belonging to defendant's girlfriend; Pickens followed the car to a location near defendant's residence; defendant fit the description that Pickens set forth in the report; several items belonging to defendant were found in the car; and defendant's girlfriend told Pickens that defendant had been driving her car that night.  Thus, defense counsel could not merely allege that Pickens was lying.  Accordingly, the trial court did not abuse its discretion in denying the motion.

*People v. Hustead* (1999) 74 Cal.App.4th 410 is distinguishable from the case before us.  In *Hustead*, the defendant was charged with, among other things, evasion of arrest.  (*Id*. at p. 412.)  The defendant's *Pitchess* motion included defense counsel's declaration which stated that the officer fabricated the defendant's alleged dangerous driving.  (*Id.* at pp. 417-418.)  The declaration also stated that the defendant asserted that

he did not drive in the manner described in the officer's report and his driving route was different from that claimed by the officer. (*Id.* at p. 417.) Thus, unlike in the present case, the declaration in *Hustead* described a factual scenario that supported the officer's alleged misconduct.

Defendant argues that "the motion and declaration suggested an alternative version of the facts that supported [his] defense." There was no such suggestion. Though the supporting memorandum stated that defendant "denie[d] being the driver of the vehicle," the declaration alleged that defendant "was not driving the vehicle in the manner discussed in the Monterey County Sherriff's reports that are attached." Thus, since the declaration disputed the manner in which defendant was driving, it failed to allege facts that supported his defenses of mistaken identity and third party culpability.

Alternatively, defendant contends that his counsel rendered ineffective assistance.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) However, "'[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Defendant argues that defense counsel's performance was deficient because he failed to submit an amended declaration that alleged the theory advanced at trial: defendant lent the car to a friend, who was also an African-American male, his friend was

10

driving the car when Pickens conducted the traffic stop, and Pickens's broadcast of the suspect's description omitted defendant's facial birthmark.

However, the record on appeal does not indicate why defense counsel failed to file an amended declaration. Defense counsel may well have learned from a colleague or some other source that there was nothing in Pickens's personnel file that would have assisted the defense. Thus, based on this record, we must reject defendant's claim of ineffective assistance of counsel.

**B. Admissibility of Evidence**

Defendant also contends that the trial court erred when it excluded evidence of Pickens's prior dishonesty.

**1. Background**

Prior to trial, defense counsel objected to the exclusion of evidence that he intended to use solely to impeach the credibility of Pickens. The evidence consisted of an application for modification of sentence in an unrelated case, *People v. Tetrick*, case No. SS060958A, filed on May 14, 2007. Defense counsel stated that "if Deputy Pickens did indeed file a document with the Court that was forged by him misrepresenting information, I think that's relevant to his credibility. I don't think it's a waste of time. I don't think it would fall under 352, and I would ask that the Court not exclude that information."

The following exchange occurred at the hearing: "MR. O'KEEFE: That the answers contained within this document -- I don't remember the numbers exactly to all questions. It was maybe three or four -- dealt with a conversation that -- well, that form was filled out, according to my sources by Deputy Pickens. I believe he's admitted to this under oath. I also know that the handwriting has been looked at by a couple of members of the DA's office, most notably Todd Hornik was one of the individuals [t]hat

11

did do a handwriting comparison. The answers contained therein talk about a conversation that was had with one of the deputy district attorneys Rick Storms to attempt to have a modification or sentence reduced. I have a memo from Mr. Storms if the Court would like to see that, stating he never had any such conversation with Deputy Pickens, and the information contained on this form is a lie. . . . I did speak to Mr. Storms this morning. He told me his statement remains the same; that he never gave Deputy Pickens any permission to file anything with the Court. He said he simply told Deputy Pickens the process he would need to follow. [¶] THE COURT: Okay. And the form that I've been presented with is something that can be filled out by a defendant or by anyone else, and there is a signature at the bottom that appears to be Brad Tetrick. [¶] MR. O'KEEFE: That's correct. [¶] THE COURT: And you can't tell if the person filled out the form is the same person that signed it or not, because they're in two different types of writing. [¶] MR. O'KEEFE: And they appear that they are not. Those actually appear to be the signature of Mr. Tetrick. . . . [¶] THE COURT: So you're showing -- this is being presented to the Court to request that the Court do what? [¶] MR. O'KEEFE: Well, I'm offering it as an opposition to the People's motion number 10. I don't think this information should be excluded. I think that I still have some investigation that needs to be conducted. I do think that it's relevant to this case. The credibility of Deputy Pickens is the -- maybe not the only issue but certainly the primary issue in this matter, and I continue to come into new information as I attempted to investigate this since Friday. I'm trying to get to the bottom of it as fast as I can. [¶] THE COURT: The document that you're presenting to me, you're not claiming that the signature on here is a forged signature? [¶] MR. O'KEEFE: It's the information contained within is forged by Deputy Pickens. [¶] THE COURT: Well, forged means that you are writing it on behalf of someone else and claiming that it is someone else. These forms are frequently filled out by attorneys or others, and then the probationer

12

signs the bottom. [¶] MR. O'KEEFE: I agree with that. But most notably what that form is doing is it is claiming that Deputy DA Storms approved or agreed to a sentence being modified and reduced for an individual. And that never happened. That's the crux of the issue. I do think that it is technically a forgery, [although] it's not the most typical form of forgery. I think offering a document to superior court in the State of California in an attempt to have the sentence modified would fall under one of the 470 subsections. [¶] THE COURT: Okay. Is this copy something that can be made a court document? [¶] MR. O'KEEFE: I have no objection. [¶] THE COURT: I'll make this part of the record in this matter. It will be Court Document Number 1. And I'm not hearing anything thus far that -- I'm hearing that you are wanting to impeach Deputy Pickens and claim that he is not a truthful individual with an incident involving another defendant where you are claiming that Deputy Pickens assisted someone in petitioning the Court for modification of sentence based on -- or this petition appears to say that the deputy district attorney was spoken to with regard to this petition for modification of probation. I'm not hearing anything that would be directly impeaching of Deputy Pickens at this time. And what I'm hearing is that the information that's being provided is kind of tangential impeachment at best that appears thus far would take a significant amount of time. I'm not -- it does not appear to be relevant at this stage in the game, the information that you've provided me. And maybe that's because it's not been developed fully. I'm not going to prohibit you from developing it fully, because that's something you'll do outside of court. But from what I've heard thus far, I don't find anything that is worthy of kind of impeachment cross-examination and going further into if he doesn't answer the questions the way you want, which would be bringing in other witnesses to testify about a document that, as I say, is not -- certainly is not directly related to this incident and, at best, the statements in here are even tangentially made. When I say they're tangentially made, number two says, 'I hereby make the following request for modification.'. . . And

13

in print it says, 'modification of sentence per district attorney DA Rick Storms possible early termination.' Well, there's not a -- there's nothing there that says Storms agreed to an early termination and nothing there truly directing the Court. [¶] The next question, number three is, 'This modification is based upon the following reasons,' and it says, 'State the particular reasons.' And the words that are in writing are 'Spoke with: District attorney regarding possible remaining' -- I think that's 'remaining work furlough, supervised home release and possibly time served,' which is not really a representation to the Court that there has been a commitment or an agreement with the district attorney's office either. So that's why I'm putting this on the record, because as I'm saying, there is nothing here that is a direct statement. It's -- there's no true representations other than there was a conversation without any real representations in that conversation. It appears to the Court that it would be difficult to impeach someone based on a conversation that makes no commitment or statement in this application for modification, that truly makes no commitment, nor does it say that the district attorney promised anything. [¶] As I say, I'm not prohibiting you from continuing to develop this, but I don't see anything that at this point would clear the burden of 352, which is that, for whatever use the probative value would be, it appears to this Court, at this stage anyway, that it would confuse the issues and involve an undue consumption of time and not bare [*sic*] directly on the matters and issues in this case. As I say, I'm more than happy to hear anything else that you develop as your investigation continues. [¶] MR. O'KEEFE: That would be my only request, that I be allowed to revisit this issue as the days go on if I come up with new information. [¶] THE COURT: Yes. The Court will allow that. [¶] MR. FROST [Prosecutor]: So at this point, the Court is granting the People's motion number 10, then, subject to that ruling? [¶] THE COURT: I'd say that it's a -- let me just read People's motion. 'People object to the admission of testimony or evidence concerning an allegation contained in a memo dated 2007 about Sergeant Pickens.'. . . But the Court's

14

ruling at this time is that I don't find that the impeachment - - any impeachment evidence that might be related to the May 2007 application for modification of probation would assist this jury, and I do find that under 352 at this point it would not be admissible. So unless we talk about it any further, that will be the Court's ruling."

## 2. Analysis

Evidence Code section 352 provides the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134.)

Defendant argues that the excluded evidence "allegedly showed [Pickens] had intentionally made material misrepresentations about a criminal defendant's case."

We first note that defendant did not contend either at the hearing or later that Pickens signed the document. Even assuming that defendant was able to establish that Pickens filled out the form, there were no misrepresentations. Defendant claims that "Pickens purported that he prepared the court-filed document at the behest of a district attorney, who denied any communications with Pickens about the matter" and that "Pickens falsely conveyed that the district attorney had agreed to a sentence modification." However, as the trial court pointed out, the document refers to a "modification of sentence per district attorney . . . possible early modification" and "spoke with district attorney regarding possibly removing work furlough, supervising home release, and possibly time served." There is nothing in the application stating that the district attorney approved of the application. Moreover, though defense counsel claimed that Storms stated that he never talked to Pickens and that the "information contained on this form is a lie," he later asserted that Storms "said he simply told Deputy

15

Pickens the process he would need to follow." Based on defense counsel's statements, Storms apparently did discuss an application by this defendant with Pickens. In the event that Pickens would testify that he had spoken to Storms, the issue would be the extent to which Pickens's understanding of that conversation differed, if at all, from Storms's understanding. Given this record, defense counsel failed to proffer any evidence to prove that Pickens's filling out of the form for another defendant tended to prove that Pickens was dishonest. Since the trial court reasonably concluded that the probative value of the evidence was substantially outweighed by the danger of confusing the issues and necessitating an undue consumption of time, defendant has failed to show the trial court abused its discretion in excluding this evidence.

## C. Section 654

Defendant next contends that the trial court's imposition of sentence as to the possession of a firearm by a felon (§ 29800, subd. (a)) must be stayed pursuant to section 654.

At the sentencing hearing, defense counsel argued that section 654 applied because defendant had the same criminal objective with respect to the possession of a firearm by a felon and the possession of a controlled substance while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a)). The prosecutor argued, "I don't think it is 654, because it is different elements. Clearly his status as a felon would dictate that." The trial court concluded: "As far as the 29800, again, a different set of facts. The defendant is a felon, and as a result, it's illegal for him to possess weapons. The Court does not find that it's 654. The Court -- prior Courts have not found it to be 654, and this Court does not either."

Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

16

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, section 654 prohibits multiple punishment for a single act or indivisible course of conduct. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)

"'"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."' [Citation.] [¶] . . . 'It is [the] defendant's intent and objective, not temporal proximity of his offenses, which determine whether the transaction is indivisible.' [Citation.] '"The defendant's intent and objectives are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced."' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885-886.)

*People v. Jones* (2012) 54 Cal.4th 350 (*Jones*) is instructive. In *Jones*, the police searched the defendant's car and found a loaded revolver. (*Id.* at p. 352.) The defendant, who was a convicted felon, asserted that he had bought the gun three days earlier "'for protection.'" (*Ibid.*) He claimed that he kept the gun at his grandmother's house and "'just picked the gun up from there and that's why the gun was in the car.'" (*Ibid.*) The defendant was conviction of possession of a firearm by a felon, carrying a readily accessible concealed and unregistered firearm, and carrying an unregistered loaded firearm in public. (*Ibid.*) *Jones* held that "a single possession or carrying of a single firearm on a single occasion may be punished only once under section 654." (*Id.* at p. 357.)

*Jones* overruled *In re Hayes* (1969) 70 Cal.2d 604, which permitted punishing the defendant for simultaneously driving while intoxicated and while possessing an invalid

license.  (*Jones*, *supra*, 54 Cal.4th at pp. 356, 358.)  *Jones* rejected *Hayes's* rationale that multiple punishment was permissible when the statutes violated by the defendant had distinct societal purposes.  (*Jones*, at p. 356.)  *Jones* also disapproved *People v. Harrison* (1969) 1 Cal.App.3d 115, which had relied on *Hayes* in holding that separate punishment for possession of a concealable firearm by a felon and possession of a loaded firearm was permissible even though both offenses involved the same firearm.  (*Jones*, at p. 357.)

Jones cited with approval *People v. Williams* (2009) 170 Cal.App.4th 587.  (*Jones*, *supra*, 54 Cal.4th at p. 357.)  In *Williams*, the officers searched a house and garage and found methamphetamine, sales paraphernalia, and a loaded handgun.  (*Williams*, at pp. 596-597.)  The defendant was convicted of, among other things, possession of a firearm by a felon and possession of a controlled substance while armed.  (*Id.* at p. 595.)  *Williams* held that the trial court erred by failing to stay the term for felon in possession under section 654, because the trial court had found that both acts of firearm possession occurred with the same intent and objective.  (*Williams*, at pp. 645-646.)

Jones recognized that "[i]n some situations, physical acts might be simultaneous yet separate for purposes of section 654.  For example, 'simultaneous possession of different items of contraband' are separate acts for these purposes.  [Citations.]"  (*Jones*, *supra*, 54 Cal.4th at p. 358.)  *Jones* also noted that cases, which permitted multiple punishment when the possession of a firearm by a felon was antecedent and separate from a crime committed with that firearm, were distinguishable from the case before it.  (*Id.* at p. 358, fn. 3.)

Without any citation to the record, the Attorney General argues that "there was a basis to infer that [defendant's] possession of the firearm was separate and distinct from his possession of the gun to commit drug and evasion offenses."  We disagree.

Here, the crimes of possession of a firearm by a felon and possession of a controlled substance while armed with a firearm were committed contemporaneously.

18

There is nothing in the record to suggest that the two offenses involved separate or different acts. Both crimes involved the intent and objective to possess the same firearm on the same occasion. As to each of these counts, the prosecutor's argument to the jury was based on the same evidence, that is, defendant's possession of the firearm in the car and then taking the firearm with him when he exited his car. Based on this record, the trial court erred in refusing to stay the 16-month term for the conviction for possession of a firearm under section 654.

### III.    Disposition

The judgment is modified to stay under section 654 the term imposed for the possession of a firearm by a felon count. The trial court is directed to prepare an amended abstract of judgment reflecting this change and to forward a certified copy of the amended abstract to the California Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.